USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 95-1704 EDMUND H. BELANGER, ET AL., Plaintiffs, Appellants, v. WYMAN-GORDON COMPANY, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _________________________ Mark I. Zarrow, with whom Lian, Zarrow, Eynon & Shea was on _______________ __________________________ brief, for appellants. John O. Mirick, with whom Mirick, O'Connell, DeMallie & _______________ _______________________________ Lougee was on brief, for appellee. ______ _________________________ December 14, 1995 _________________________  SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. ______________ decide what constitutes a benefit "plan" for purposes of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.  1001-1467 (1988). The heart of the appellants' case is their contention that a series of four early retirement offers extended by their employer over a four-year period constitute an ERISA plan. The district court thought not, and dismissed the suit after a bench trial. We affirm. I. I. __ Background Background __________ We take the underlying facts principally from the parties' pretrial stipulations. Facing an uncertain economic future, defendant-appellee Wyman-Gordon Co. (the company) decided to reduce its work force in hopes of improving its overall financial outlook. The company made its first move in November 1987. Rather than simply laying off loyal minions, the company offered all age-qualified non- union workers (characterized as all "weekly and monthly salaried employees") an opportunity for early retirement (Offer No.1). To make departing a sweeter sorrow, the company proposed to pay, over and beyond regular retirement benefits, a lump-sum bonus amounting to one week's pay for each year of service, plus two days' pay for each year of service in excess of fifteen years, multiplied by 110%. Offer No. 1 contained no cap on the number of service years that could be included in calculating the amount of the one-time bonus. Some eligible employees accepted the 2 offer and some did not. In January 1990, the company, still in the throes of downsizing, made a similar early retirement offer (Offer No. 2). It structured this offer in much the same manner, but devised a less complicated formula for computing retirement bonuses: one week's salary for each year of service. Like Offer No. 1, Offer No. 2 did not impose a ceiling on the number of service years that could figure into the calculation. Once again, some but not all of the eligible employees accepted the offer. In corporate America, financial security is a consummation ardently sought but seldom achieved. When the company's prognosis remained gloomy, it sponsored yet another early retirement offer (Offer No. 3) in January of 1991. This offer contemplated that the amount of an individual's retirement bonus would be calculated by the same formula used for purposes of Offer No. 2 (multiplying one week's pay times the number of service years), but capped the number of years includable in the computation at twenty-five. Almost two-thirds of the weekly and monthly salaried employees who were eligible to do so accepted Offer No. 3, including the eighteen persons who appear here as plaintiffs and appellants (all of whom had spent more than twenty-five years in the company's service). Despite the winnowing that occurred over time, the company apparently convinced that strength lay in lack of numbers undertook further cost-reduction measures in October of 1991. These included salary cuts and yet another early 3 retirement offer (Offer No. 4). As with the two immediately preceding proposals, the carrot that the company dangled consisted of a bonus calculated on the basis of one week's salary for each year of service. This time, however, the company made the offer accessible to more employees (by lowering the minimum age for early retirement) and abjured any ceiling on the maximum number of service years includable in figuring the lump sum. Thirty-eight of forty-six eligible employees accepted Offer No. 4. The appellants were displeased no little (and quite some) upon learning of the more generous terms embodied in Offer No. 4. Each of them had accepted a capped offer Offer No. 3  as an inducement to take early retirement, and the cap effectively reduced their early retirement bonuses by an average of roughly $9,950 per retiree. They sued the company, alleging inter alia that the series of four early retirement offers _____ ____ constituted a plan under the terms of ERISA, 29 U.S.C. 1002; that the plan failed to comply with ERISA's imperatives, e.g, the company had not provided a written plan description or a protocol for amendment, see 29 U.S.C. 1022 & 1102; and that these ___ violations entitled them to damages based on what they would have received had Offer No. 3 not been capped, together with interest, counsel fees, and other redress. After conducting a non-jury trial, the district court rejected the central premise underlying the appellants' claim. The court held that the early retirement offer which the 4 appellants accepted did not constitute a plan for ERISA purposes, and that, therefore, the company was not obliged to heed ERISA's requirements. See Belanger v. Wyman-Gordon Co., 888 F. Supp. 9, ___ ________ ________________ 12 (D. Mass. 1995). The appellants assign error.1 II. II. ___ Discussion Discussion __________ A. A. __ Standard of Review Standard of Review __________________ The question whether a given employee benefit or set of benefits is a plan properly governed by the strictures of ERISA requires a certain level of judicial versatility. Because an inquiring court must both assess the facts and apply the law, two different standards of review come into play. "For purposes of appellate review, mixed questions of fact and law ordinarily fall along a degree-of-deference continuum, ranging from plenary review for law-dominated questions to clear-error review for fact-dominated questions." Johnson v. Watts Regulator Co., 63 _______ ____________________ F.3d 1129, 1132 (1st Cir. 1995). At the near end of the continuum, the district court's interpretation of the word "plan" as it is used in ERISA poses a question of law subject to de novo review. At the far end of the continuum, the court's inquiry into the nature and scope of the benefits actually at issue in the instant case demands factfinding, and is to that extent  ____________________ 1In the district court, the appellants also raised other claims. The court found against them on all fronts, see ___ Belanger, 888 F. Supp. at 12-13, and only this ERISA claim has ________ been preserved for review. 5 reviewable only for clear error. In other words, as long as the trial court accurately applies the relevant legal standards, the existence vel non of an ERISA plan is principally a question of ___ ___ fact, and the court of appeals must defer to the district court's judgment unless that judgment is clearly erroneous. See Wickman ___ _______ v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir.), ____________________________ cert. denied, 498 U.S. 1013 (1990); see also Cumpiano v. Banco _____ ______ ___ ____ ________ _____ Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990) (explaining ______________ that there is no clear error "unless, on the whole of the record, [the court of appeals] form[s] a strong, unyielding belief that a mistake has been made"). B. B. __ The Meaning of "Plan" The Meaning of "Plan" _____________________ The text of ERISA itself affords scant guidance as to what constitutes a covered "plan." The statute, 29 U.S.C.  1002(2)(A), merely constructs a tautology, defining an employee benefit plan as "any plan, program or fund" established or maintained by an employer that provides certain benefits to employees. Relying on the purposes undergirding the statute to give meaning to this cryptic language, the Supreme Court has made it very clear that an employee benefit may be considered a plan for purposes of ERISA only if it involves the undertaking of continuing administrative and financial obligations by the employer to the behoof of employees or their beneficiaries. See ___ Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 12 (1987); see _________________________ _____ ___ also District of Columbia v. Greater Wash. Bd. of Trade, 113 S. ____ ____________________ ___________________________ 6 Ct. 580, 584 n.2 (1992) (construing Fort Halifax as holding that ____________ a plan exists only if an employer has "some minimal, ongoing `administrative' scheme or practice"). Fort Halifax is the beacon by which we must steer. _____________ There, the Court rejected an ERISA preemption challenge to a Maine statute requiring employers to tender a one-time severance payment to displaced employees in the event of a plant closing. The Court held that Maine's plant-closing law did not succumb to ERISA's preemptive force because the legislatively mandated tribute comprised no more than a "one-time, lump-sum payment triggered by a single event." 482 U.S. at 12. Consequently, the state statute neither "establishe[d], nor require[d] an employer to maintain, an employee benefit plan." Id. (emphasis in ____ ___ original). Two of ERISA's cardinal goals protection of employers and protection of employees appear to have influenced the Court's interpretation of what constitutes a plan. As to the former goal, the Court acknowledged that Congress designed ERISA's preemption provision partially to protect employers from a "patchwork scheme" of regulations in respect to employee benefits. Id. This concern has little or no pertinence, the ___ Court reasoned, in a one-time payment situation in which the employer's only obligation is to draw a single check. See id. ___ ___ By contrast, this concern is highly pertinent in respect to employee benefits that place "periodic demands" on employer assets, "creat[ing] a need for financial coordination and 7 control." Id. ___ As to ERISA's other, more important goal, the Court recognized that, in general, ERISA's substantive protections are intended to safeguard the financial integrity of employee benefit funds, to permit employee monitoring of earmarked assets, and to ensure that employers' promises are kept. See id. at 15. Since ___ ___ a single-shot benefit requires no greater assurance than that the check will not bounce, ERISA's panoply of protections has virtually nothing to do with such a simple task. See id. at 16. ___ ___ More elaborately structured benefits, however, raise a different set of concerns. As the Court observed, ongoing investments and obligations are uniquely vulnerable to employer abuse or employer carelessness, and thus require ERISA's special prophylaxis. See ___ id. ___ The upshot is that, in the albedo of Fort Halifax, the ____________ existence of a plan turns on the nature and extent of an employer's benefit obligations. Withal, making particularized judgments in this area on the basis of vague etchings of policy is no mean feat. As we wrote on an earlier occasion, "so long as Fort Halifax prescribes a definition based on the extent and _____________ complexity of administrative obligations, line drawing . . . is necessary and close cases will approach the line from both sides." Simas v. Quaker Fabric Corp., 6 F.3d 849, 854 (1st Cir. _____ ___________________ 1993). There is no authoritative checklist that can be consulted to determine conclusively if an employer's obligations 8 rise to the level of an ERISA plan. While a wide array of factors may be suggestive, typically "no single act in itself necessarily constitutes the establishment of the plan, fund or program." Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. _______ __________ 1982) (en banc). Yet, some factors tend to be more indicative of the existence of a plan than others. One very important consideration is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits. See Henglein v. Informal Plan for ___ ________ __________________ Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 400 ______________________________________________ (3d Cir. 1992); Donovan, 688 F.2d at 1373; cf. Johnson, 63 F.3d _______ ___ _______ at 1135 (advocating that courts should judge the question of whether an employer "established or maintained" a benefit plan within the scope of ERISA "from the employees' place of vantage"). Thus, evidence that an employer committed to provide long-term or periodic benefits to its employees will often be telling. See Henglein, 974 F.2d at 400; see also Kenney v. ___ ________ ___ ____ ______ Roland Parson Contracting Corp., 28 F.3d 1254, 1258-59 (D.C. Cir. _______________________________ 1994) (explaining that a plan may be created, even in the absence of formal documentation, by "an employer's representation that a plan has been established, in conjunction with any action, such as withholding wages for contribution to such a plan, that tends to confirm its representations"). Anticipating this reality, this court stated in Wickman, 908 F.2d at 1083, that the "crucial _______ factor in determining if a `plan' has been established is whether 9 the [proffering of an employee benefit] constituted an expressed intention by the employer to provide benefits on a regular and long term basis." We end where we began. In this cloudy corner of the law, each case must be appraised on its own facts. All that can be stated with assurance is that Fort Halifax controls. Thus, so ____ _______ long as a proffered benefit does not involve employer obligations materially beyond those reflected in Fort Halifax, see Simas, 6 ____________ ___ _____ F.3d at 853-54, the benefit will not amount to a plan under the ERISA statute.2 C. C. __ Analysis Analysis ________ Viewed against this backdrop, the district court's conclusion that ERISA did not apply to the series of early retirement offers is eminently supportable. Nothing in the offers, whether they are assessed individually or in the aggregate, reflects the company's assumption of an ongoing administrative or financial obligation to its employees within the purview of Fort Halifax. ____________ Taken singly, the early retirement offers involve  ____________________ 2Simas involved a situation in which an employer had to _____ fulfill, under state law, obligations analogous to, but materially beyond, those imposed under the Maine statute at issue in Fort Halifax. The Massachusetts statute addressed in Simas, _____________ _____ unlike the Maine statute, required individualized employer determinations, based on at least one nonmechanical criterion, over a prolonged time period. See Simas, 6 F.3d at 853. Thus, ___ _____ we held that ERISA preempted the Massachusetts statute because the statute imposed obligations on the employer equivalent to those involved in an ERISA plan. See id. at 853-54. ___ ___ 10 precisely the kind of one-time, lump-sum payment that the Fort ____ Halifax Court clearly excluded from the pantheon of ERISA plans. _______ See 482 U.S. at 12. The company's offers hinged on a purely ___ mechanical determination of eligibility and, if accepted, required no complicated administrative apparatus either to calculate or to distribute the promised benefit. The offers pivoted on a single, time-specific event. They did not involve promises that had to be kept over a lengthy period, nor did the company thereby make any lasting financial commitment of a type that might implicate ERISA's substantive protections. The bottom line is that the company did no more than propose to write a single check to each eligible employee who accepted an early retirement offer. If this is not Fort Halifax redux, it is ____________ sufficiently close to the Fort Halifax model that it falls ____________ outside ERISA's sphere. See Fort Halifax, 482 U.S. at 12; see ___ ____________ ___ also Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 258 ____ ________ ___________________________ (8th Cir. 1994) (holding that a severance plan involving a one- time payment is not an ERISA plan); Angst v. Mack Trucks, Inc., _____ __________________ 969 F.3d 1530, 1539 (3d Cir. 1992) (similar); Fontenot v. NL ________ __ Indus., Inc., 953 F.2d 960, 962-63 (5th Cir. 1992) (similar). ____________ The more intriguing question in this case is whether the incidence of serial offers the fact that the company made not a lone offer but a succession of offers over a period of roughly four years changes the result. We do not believe that it does. Each of the four early retirement offers, in and of itself, is beyond ERISA's reach. The appellants have not 11 advanced any convincing reason why the sheer number of ERISA- exempt early retirement offers, without more, serves to alter the Fort Halifax analysis. To be sure, in some circumstances a _____________ parade of early retirement offers might constitute a plan under ERISA where, for example, employees rely on the promise of future offers. Cf. Moeller v. Bertrang, 801 F. Supp. 291, 294-95 ___ _______ ________ (D.S.D. 1992) (emphasizing the importance of employee reliance on employer promises of future benefits). But this record reveals no such concatenation of circumstances. Here, the whole is no greater than the sum of the parts. Three pieces of information confirm this conclusion. First, the administration of the offers neither required a special mechanism nor engendered a need for nonmechanical decisionmaking. Second, the record is devoid of any evidence that the serial offers were the product of a prearranged design or that the company ever represented to its work force that they were linked in a defined sequence. Consequently, the employees had no promises of financial obligation on which to rely, and, thus, no need for ERISA's substantive protection. The finishing touch is the district court's factual finding that the offers did not impose continuing obligations of either an administrative or a financial nature. See Belanger, 888 F. Supp. at 12. The ___ ________ appellants have pointed to no facts that remotely contradict this factual finding. To sum up, it appears that the company devised each offer without giving thought to possible future offers, and that 12 each offer was motivated by a bona fide need to reduce costs. Just as four eggs, without more, do not make an omelette, four independent early retirement offers, without visible ties to each other and without proof of an enduring obligation owed by the employer to the employees, do not make an ERISA plan.3 III. III. ____ Conclusion Conclusion __________ We need go no further. The district court found, as a matter of fact, that the company's four early retirement offers involved no continuing administrative or financial obligation on its part, and thus concluded, as a matter of law, that the offers together did not constitute a plan under ERISA. On this record, we emphatically agree. Affirmed. Affirmed. ________  ____________________ 3Although the appellants press heavily on the fact that the same executive designed each retirement offer, this does nothing to prove that he did so as part of an ERISA plan. Indeed, the _________________________ uncontroverted evidence strongly suggests that successive offers were necessary only because the corporate profit-and-loss statement failed to recuperate in the projected time frame. 13