Jeanne B. DEMARS, Plaintiff, Appellant,

v.

CIGNA CORPORATION and Insurance Company of North America, Defendants, Appellees.

No. 98–1962.

United States Court of Appeals, First Circuit.

Heard Jan. 7, 1999.

Decided April 6, 1999.

Kenneth C. Brown, with whom Jared R. Green and Abramson, Reis, Brown & Dugan were on brief, for appellant.

Eleanor H. MacLellan, with whom Sulloway & Hollis, P.L.L.C. was on brief, for appellees.

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Jeanne B. Demars brought this suit against the Insurance Company of North America ("ICNA"), the provider of her long-term disability insurance, and ICNA's parent corporation CIGNA Corporation ("CIGNA"), after CIGNA—upon reviewing the accuracy of information on a conversion application Demars had submitted seven years earlier—recalculated her disability benefit level and demanded that she remit alleged overpayments totaling more than $70,000. Demars brought state law claims of unfair trade practices, breach of contract, intentional infliction of emotional distress, bad faith breach of contract, and bad faith refusal to pay an insurance claim, as well as a claim for disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

The sole question on appeal is whether ERISA preempts all state law claims related to an individual insurance policy obtained by an employee after termination of employment through the exercise of conversion rights granted by an employee welfare benefit plan. In other words, we consider whether ERISA regulation extends to "conversion policies." The district court found that it does and therefore granted defendants' motion to dismiss Demars's state law claims. We reverse.

## I

For the purposes of a motion to dismiss, we accept as true the facts alleged in the complaint. See Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 3 (1st Cir.1998). Demars began working as an agent for National Life of Vermont ("National Life") in 1983. As a National Life employee, she was entitled to enroll in a group long-term disability policy underwritten by ICNA. National Life's group policy included a "conversion clause" that permitted employees to convert from group disability coverage to individual policies when their employment with National Life came to an end. Demars initially enrolled in the group disability policy. In 1990, when she left National Life, she elected to convert her group coverage to an individual ICNA policy.

ICNA's conversion application consisted of two pages. The first page, to be filled out by the applicant, asked for general information. The second page was to be completed by Demars's employer. Since Demars had already left National Life, she considered her employer to be Demars Financial Services, Inc., a business that she and her husband ran. Accordingly, in response to a question about her earnings at the time of termination, she did not report her final National Life salary; instead, she reported the gross annual commissions she earned as an employee of Demars Financial Services.

In August 1990, ICNA notified Demars that her application had been approved, sent her a certificate of insurance for the conversion policy, and requested an initial premium payment. Demars paid the initial premium and the quarterly premiums thereafter.

In November 1993, Demars filed a claim with ICNA for long term disability benefits. Her claim was approved in April 1994, and ICNA commenced monthly payments of $1,972 ($3,000 less Social Security disability benefits) in May 1994.

In March 1997, CIGNA requested that Demars forward financial information pertaining to the years 1990 through 1996. After examining this information, CIGNA concluded that Demars had incorrectly reported her income on the conversion application, that she was actually entitled only to a $100 minimum monthly benefit, and that ICNA had therefore overpaid her by more than $70,000 between May 1994 and June 1997. CIGNA sent Demars a letter dated June 26, 1997 that explained these conclusions and informed her that CIGNA would withhold all further monthly benefit payments (now set at $100) until she had repaid the sums allegedly owed. Demars

has not received any benefit payments since that date.

Rather than repaying CIGNA the allegedly excessive benefits and accepting the reduction in future benefits, Demars brought suit against CIGNA and ICNA, asserting both diversity and federal question jurisdiction. After Demars stipulated to the dismissal of her ERISA claim and the district court granted the defendants' motion to dismiss her state law claims, judgment was entered against Demars, who now appeals.

## II

██ We review de novo the legal question whether ERISA preemption applies to claims arising from a conversion policy,[1] see *Degnan v. Publicker Indus., Inc.*, 83 F.3d 27, 29 (1st Cir.1996), and begin with the words of the statute. Section 1144(a) states that ERISA provisions "shall supercede any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a).

We note at the outset that Demars's state law claims clearly "relate to" her conversion policy in the sense intended by § 1144(a), since in order to prevail on those claims Demars would need to prove the existence of, or specific terms of, the conversion policy. See *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 140, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (stating "relates to" test); see also *McMahon v. Digital Equip. Corp.*, 162 F.3d 28, 38–39 (1st Cir.1998) (applying *Ingersoll–Rand* test to breach of contract and unfair trade practice claims).

██ Defendants would like us to complete the analysis by asking "whether the conversion policy is sufficiently connected

to[ ] (or related to) the underlying ERISA plan." They argue that the conversion policy and the ERISA plan are clearly "connected" or "related" to each other, since Demars obtained the conversion policy by virtue of rights granted by National Life's group disability benefits plan. We do not disagree with this point; there is obviously a type of "but for" relationship linking Demars's conversion policy and National Life's ERISA plan. But "infinite relations cannot be the measure of preemption." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). If a chain of "relates to" links could establish ERISA preemption, then ERISA preemption and ERISA regulation could be separated in an anomalous way. The proper question to ask under § 1144(a) is not whether Demars's claims relate to her conversion policy, which relates in turn to an ERISA plan, but rather whether the conversion policy is itself subject to ERISA regulation as an ERISA plan.

The statute defines an "employee welfare benefit plan" (the type of ERISA plan at issue here, see 29 U.S.C. § 1002(3)) as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... benefits in the event of sickness, accident, disability, death or unemployment.

29 U.S.C. § 1002(1).

██ This nearly tautological definition offers little guidance. The key phrase for present purposes is "established or maintained by an employer." Demars's conversion policy was certainly "established" in

---

1. A more exact definition of this term may be helpful at this point. Consistent with the usual practice, we use the label "conversion policy" to refer only to a private (non-employer-financed) insurance policy obtained by a former employee, after termination, through the exercise of conversion rights. We do not

use the term "conversion policy" to refer to the guaranteed option to convert from employer-sponsored coverage to a private insurance policy (this is a "conversion right"), nor do we use the term "conversion policy" to refer to an employer plan that contains conversion rights.

some sense by her former employer—but was it "established" in the relevant sense? Case law provides no definitive answers. "[N]o single act in itself necessarily constitutes the establishment of the plan, fund, or program," *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc), *quoted in Belanger v. Wyman–Gordon Co.*, 71 F.3d 451, 455 (1st Cir.1995), and "[t]here is no authoritative checklist that can be consulted" to determine whether an employer's actions establish an ERISA plan, *Belanger*, 71 F.3d at 455.

In passing ERISA, Congress's purpose was twofold: to protect employees and to protect employers. *See McMahon*, 162 F.3d at 35–36. Congress wanted to safeguard employee interests by reducing the threat of abuse or mismanagement of funds that had been accumulated to finance employee benefits, *see Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), while at the same time safeguarding employer interests by eliminating "the threat of conflicting and inconsistent State and local regulation" of employee benefit plans, *Travelers*, 514 U.S. at 657, 115 S.Ct. 1671 (quoting 120 Cong. Rec. 29197 (1974)).

Neither concern seems to be strongly implicated here. There is little threat of abuse of funds in the ERISA sense. While there is a risk that funds accumulated to finance benefits under the conversion policy could be mismanaged or abused, there is no risk of Demars's former employer abusing or mismanaging these funds, since it does not control them, or indeed have any tie to them. Rather, it is the insurers who issued the policy—defendants here—who are in a position to possibly abuse or mismanage the funds. Yet Congress placed into ERISA an express disavowal of any intent to regulate insurers *qua* insurers. *See* 29 U.S.C. § 1144(b)(2).

█  The uniformity of regulations concern is equally attenuated. While conver-

sion policies like Demars's undoubtedly impose an administrative burden, that burden lies on the insurers who provide the policy, not on the former employer. As *Fort Halifax* noted, "Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises ... with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax*, 482 U.S. at 11, 107 S.Ct. 2211. Thus, "an employee benefit may be considered a plan for purposes of ERISA only if it involves the undertaking of continuing administrative and financial obligations by the employer." *Belanger*, 71 F.3d at 454. Under this analysis, conversion policies are not ERISA plans, because employers do not bear any administrative or financial responsibility for them.

Defendants argue that there is a residual uniformity interest affecting employers. They point out that if different states can regulate conversion policies, then there will be differential costs associated with the provision of conversion policies in the different states. These differential costs could drive up the costs of granting conversion rights and thus reduce the incentive of employers with employee welfare benefit plans to grant those rights. This may or may not be true, but it does not, in any event, argue for ERISA preemption of state law claims relating to conversion policies. That is because "cost uniformity was almost certainly not an object of [ERISA] pre-emption." *Travelers*, 514 U.S. at 662, 115 S.Ct. 1671. ERISA preemption was intended to guarantee regulatory uniformity, not intrastate or interstate cost uniformity. *See id.* (rejecting argument that ERISA demands the equalization of "relative costs of various health insurance packages in a given state"); *De Buono*, 520 U.S. at 816, 117 S.Ct. 1747 (noting that ERISA does not attempt to equalize the cost of benefits across states).[2]

2.  The questions addressed by *Travelers* and *De*     *Buono* may not appear at first blush to resem-

Other arguments bolster the conclusion that conversion policies are not subject to ERISA. A Department of Labor regulation interpreting the term "employee welfare benefit plan," while not directly on point, provides a useful analogy. Section 2510.3–1(j) creates a "safe harbor" for certain "group or group-type insurance programs": a group or group-type insurance program offered by an employer will not be considered to be an employee welfare benefit plan if the employer does not make contributions to and receives no consideration from the insurer, employee participation in the program is voluntary, and the employer's sole functions are to permit the insurer to publicize the program to employees and to collect and remit premiums to the insurer. *See* 29 C.F.R. § 2510.3–1(j) (1998). The regulation is not directly applicable to Demars's conversion policy, since hers is not a group policy or even a "group-type" policy, and since granting a conversion right is not identical to "publicizing" an insurance program. But the logic of ERISA suggests that a conversion policy like Demars's would be even more securely anchored in a safe harbor than the type of policy addressed by § 2510.3–1(j), since her policy does not require any ongoing employer involvement.

Moving from analogy to contrast, the "continuation coverage" mandated by the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.*, provides an instructive counterpoint to the conversion policy considered here. COBRA amended ERISA in 1985 to require employers to permit an employee to continue group coverage for up to eighteen months after termination of employment, if the employee elects to do so and agrees to reimburse the employer for up to 102% of the average per-employee cost of that group coverage. *See* 29 U.S.C. § 1162. Unlike coverage under a conversion policy, COBRA continuation coverage does place ongoing administrative burdens on the employer (since the ex-employee continues to belong to the employer's group plan), as well as ongoing financial obligations (since COBRA coverage may in fact cost the employer more than the permitted reimbursement amount). Given employers' ongoing administrative and financial involvement, courts have found that claims related to COBRA coverage are preempted by ERISA. *See Mimbs v. Commercial Life Ins. Co.*, 818 F.Supp. 1556, 1560–61 (S.D.Ga.1993) (explaining why COBRA continuation coverage is subject to ERISA regulation).

Certain practical concerns—not present in the COBRA context—also suggest that state law claims related to conversion policies should not be preempted by ERISA. Consider, for example, the effect on insurers if conversion policies were found to be ERISA plans: as ERISA plan administrators, insurers would be required to file plan descriptions and detailed annual reports with the Department of Labor, *see* 29 U.S.C. §§ 1023, 1024, and to provide regularly updated plan summaries to the plan beneficiaries, *see* 29 U.S.C. § 1022. Given the individual nature of the typical conversion policy, the insurer would presumably be required to meet these extensive requirements separately for each individual conversion policy. An even more unwarranted outcome would result if former employers, rather than insurers, were deemed to be ERISA plan administrators for conversion policies, since employers would then have to meet ERISA's reporting and disclosure requirements for all of

ble the question addressed here, since *Travelers* and *De Buono* involved challenges to state laws and focused on the proper interpretation of the term "relates to," while we must determine the boundaries of the term "employee benefit plan." Unlike the litigants in those cases, the defendants here do not challenge a state law directly, but rather ask us to remove

conversion policies from the reach of state law by declaring them to be ERISA plans. Yet the essential question under § 1144(a) is identical: because Congress did not give precise definitions for either of the two key terms in ERISA's preemption provision, the task of interpreting either term reduces to a question about ERISA's purpose.

the policies issued, perhaps by a bevy of different insurers, to an ever-growing collection of difficult-to-locate former employees.

Finally, many other courts appear to agree with our conclusion regarding the status of conversion policies, although the compatibility of certain decisions is apparent only upon close reading. A small set of decisions clearly reach the contrary conclusion—but based, we believe, on unpersuasive reasoning.

Several district courts have adopted the careful distinction between conversion rights and conversion policies that we drew at the outset and that was first drawn in *Mimbs*. *Mimbs* found that state law claims involving the right to convert are preempted by ERISA, but that claims related to the conversion policy itself are not. *See Mimbs*, 818 F.Supp. at 1561–62 (finding that "[a]ny claim that Defendant failed to offer proper conversion plan options ... relates to the ERISA plan and is pre-empted by ERISA," but that "[t]he concerns behind ERISA pre-emption are not implicated by state-law claims arising from obligations incurred under the conversion policy itself"); *see also Barringer–Willis v. Healthsource North Carolina Inc.*, 14 F.Supp.2d 780, 783–85 (E.D.N.C. 1998) (adopting *Mimbs* distinction); *Mizrahi v. Provident Life and Accident Ins. Co.*, 994 F.Supp. 1452, 1453–54 (S.D.Fla. 1998) (same); *Powers v. United Health Plans of New England, Inc.*, 979 F.Supp. 64, 69–70 (D.Mass.1997) (same); *Loudermilch v. New England Mut. Life Ins. Co.*, 942 F.Supp. 1434, 1437 (S.D.Ala.1996) (same); *McCale v. Union Labor Life Ins. Co.*, 881 F.Supp. 233, 235–36 (S.D.W.Va. 1995) (same); *Vaughn v. Owen Steel Co.*, 871 F.Supp. 247, 249 (D.S.C.1994) (same).

The Second Circuit and the Fourth Circuit have agreed with the first half of the *Mimbs* rule—that state law claims related to conversion rights are preempted by ERISA—without deciding whether ERISA regulation extends to conversion policies. *See White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997); *Howard v. Gleason Corp.*, 901 F.2d 1154, 1157–58 (2d Cir. 1990).

The Ninth Circuit has spoken less clearly on this question. One Ninth Circuit decision obviously concerned only the right to convert, *see Tingey v. Pixley–Richards West, Inc.*, 953 F.2d 1124, 1132–33 (9th Cir.1992), while a subsequent decision, *Greany v. Western Farm Bureau Life Insurance Co.*, 973 F.2d 812 (9th Cir.1992), has proven far more difficult to interpret. The dispute underlying *Greany* arose when an employee was mistakenly told that his group health insurance would terminate on a date later than it actually did, causing a gap between his group coverage and the conversion coverage he obtained. *See id.* at 814–15. The insurer quickly admitted its mistake and permitted the employee to convert his policy retroactively to the actual date of termination of the group policy. *See id.* Since the employee had already received the full amount due to him under the conversion policy, none of his panoply of claims against his former employer and the insurer sought benefits under that policy. *See id.* at 815. The relevant portions of *Greany* merely apply the first part of the *Mimbs* rule, finding state law claims related to conversion rights to be preempted by ERISA. *See, e.g., id.* at 818 (rejecting a negligence count against the employer for its actions in procuring the conversion policy because conversion rights are subject to ERISA regulation).

*Greany* is nevertheless cited for the proposition that conversion policies themselves are subject to ERISA regulation and preemption. *See, e.g., White,* 114 F.3d at 28; *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1346 (11th Cir.1994). This seems to us to be a misreading of *Greany*—an understandable misreading in light of two problematic aspects of the opinion. First, the opinion uses confusing language to refer to conversion rights.

*Compare Greany,* 973 F.2d at 817 (referring repeatedly to "conversion benefits"), *with id.* at 823 (summarizing holding as one regarding "conversion rights"). Second, *Greany* discusses the plaintiffs' unfair claims settlement practices claim without making clear that this claim was for benefits under the group policy, not the conversion policy. *See id.* at 819. Because the opinion does not make this point clear, and because of its misleading use of the phrase "conversion benefits" to refer to conversion rights, it has been incorrectly interpreted—and "headnoted"—as a decision about whether conversion policies are subject to ERISA regulation.

Some decisions have squarely held that ERISA regulation extends to conversion policies, but we do not find their reasoning persuasive. Several courts, for example, have assumed that ERISA regulation must extend to conversion policies based on an argument similar to the "relates to" argument rejected above, while failing to consider whether conversion policies implicate any of ERISA's underlying purposes. *See, e.g., Painter v. Golden Rule Ins. Co.,* 121 F.3d 436, 439–40 (8th Cir.1997) ("[T]he Conversion Policy came into being as a result of Painter exercising her right under the group policy to obtain this specific insurance policy.... As such, the Conversion Policy is a component of [the employer's] ERISA plan."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998); *Beal v. Jefferson–Pilot Life Ins. Co.,* 798 F.Supp. 673, 675 (S.D.Ala.1992) ("[P]laintiffs' right to the converted policy as well as a designation of the benefits to be contained therein existed solely by virtue of an ERISA employee benefit plan.... The Court ... finds that the policy at issue is an 'employee benefit plan' under ERISA." (citation and internal quotation marks omitted)).

A faulty analogy to COBRA coverage led the Sixth Circuit to decide that a certain type of conversion policy must be subject to ERISA. *See Massachusetts Casualty Ins. Co. v. Reynolds,* 113 F.3d 1450, 1453 (6th Cir.1997). The employer in *Reynolds* had provided ERISA-governed benefits to its employees by purchasing individual disability insurance policies for them. *See id.* Reynolds's individual conversion policy was therefore essentially the same policy he had had while an employee, except that after conversion it was Reynolds, rather than the employer, who was responsible for paying the premiums and maintaining a relationship with the insurer. *See id.* at 1452.

The *Reynolds* court found it critical that Reynolds did not switch from group to individual coverage and that the terms of his policy remained the same; these facts, said the court, made Reynolds's conversion coverage akin to COBRA continuation coverage. *See id.* (citing *Mimbs*'s discussion of COBRA). But the court's conclusion fails to reflect the actual logic behind ERISA regulation of COBRA continuation coverage. COBRA coverage is not subject to ERISA regulation merely because the terms of the coverage "continue" the specific terms of the employer's ERISA plan; rather, COBRA coverage is subject to ERISA regulation because it implicates both of ERISA's cardinal purposes.

The Eleventh Circuit also, we believe, misread *Mimbs* when it held in *Glass v. United of Omaha Life Insurance Co.,* 33 F.3d 1341 (11th Cir.1994), that a conversion policy that provided coverage to a *group* of ex-employees was "distinguishable from *Mimbs* in this respect," *id.* at 1346, and therefore subject to ERISA regulation. The court reasoned:

> The conversion in the instant case, unlike that in *Mimbs,* did not actually create an individual policy. It removed [the employee's] coverage from a group policy consisting of actively employed Silk Greenhouse employees and moved the coverage to a group policy of ex-Silk Greenhouse employees.... Clearly, [the employee's] ability to obtain the converted life insurance policy arose from the ERISA plan, and the converted policy itself continued to be integrally

linked with the ERISA plan. In this case, conversion ... did not defeat ERISA regulation.

*Id.* at 1346–47. By attempting to distinguish between group and individual conversion policies, the *Glass* decision misunderstands the logic of *Mimbs*. Both types of conversion policy fall outside the reach of ERISA, since what matters for ERISA purposes is not the nature of the conversion policy but rather the nature of the employer's ongoing administrative and financial ties to the policy. If no such ties exist, the policy should not be subject to ERISA regulation.

Finally, we note our disagreement with another frequently cited decision holding that conversion policies are subject to ERISA. The court in *Nechero v. Provident Life & Accident Insurance Co.,* 795 F.Supp. 374 (D.N.M.1992), also focused on the issue that we consider central: the extent to which conversion policies implicate ERISA's purpose of shielding employers from inconsistent state regulations. *See id.* at 378–79. However, contrary to what we have concluded, the *Nechero* court found that conversion policies do place a significant administrative burden on employers, because these policies require the employer to "track[ ] the insurance expiration of departing employees, timely inform[ ] them of their conversion option, and assist[ ] in their conversion to an individual policy if they so choose. [The employer's] involvement is ongoing as to its employees as a whole, and requires an administrative scheme." *Id.* at 379.

We agree that the administrative burdens noted in *Nechero* are real. Yet because these burdens are all tied to the conversion right, rather than the conversion policy, they do not support the conclusion that conversion policies are subject to ERISA regulation. In the end, the reasoning in *Nechero* supports the distinction recognized in *Mimbs* between conversion rights, which are subject to ERISA, and conversion policies, which are not.

## III

We hold that Demars's conversion policy is not an "employee welfare benefit plan" and that Demars's state law claims relating to the conversion policy are not preempted under § 1144(a). We express no opinion, of course, as to the merits of Demars's claims against CIGNA and ICNA.

*Reversed and remanded. Costs to appellant.*