USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1962

 JEANNE B. DEMARS,
 
 Plaintiff, Appellant,
 
 v.
 
 CIGNA CORPORATION and INSURANCE COMPANY OF NORTH AMERICA,
 
 Defendants, Appellees.
 
 ____________________
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF NEW HAMPSHIRE
 
 [Hon. Paul Barbadoro, U.S. District Judge]
 
 _____________________
 
 Before
 
 Boudin, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 ______________________
 
 Kenneth C. Brown, with whom Jared R. Green and
Abramson, Reis, Brown & Dugan were on brief, for appellant.
 Eleanor H. MacLellan, with whom Sulloway & Hollis,
P.L.L.C. was on brief, for appellees.

 ______________________
 
 April 6, 1999
 ______________________
 LYNCH, Circuit Judge. Jeanne B. Demars brought this suit
against the Insurance Company of North America ("ICNA"), the
provider of her long-term disability insurance, and ICNA's parent
corporation CIGNA Corporation ("CIGNA"), after CIGNA -- upon
reviewing the accuracy of information on a conversion application
Demars had submitted seven years earlier -- recalculated her
disability benefit level and demanded that she remit alleged
overpayments totaling more than $70,000. Demars brought state law
claims of unfair trade practices, breach of contract, intentional
infliction of emotional distress, bad faith breach of contract, and
bad faith refusal to pay an insurance claim, as well as a claim for
disability benefits under the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. 1001 et seq.
 The sole question on appeal is whether ERISA preempts all
state law claims related to an individual insurance policy obtained
by an employee after termination of employment through the exercise
of conversion rights granted by an employee welfare benefit plan. 
In other words, we consider whether ERISA regulation extends to
"conversion policies." The district court found that it does and
therefore granted defendants' motion to dismiss Demars's state law
claims. We reverse.
 I
 For the purposes of a motion to dismiss, we accept as
true the facts alleged in the complaint. See Duckworth v. Pratt &
Whitney, Inc., 152 F.3d 1, 3 (1st Cir. 1998). Demars began working
as an agent for National Life of Vermont ("National Life") in 1983. 
As a National Life employee, she was entitled to enroll in a group
long-term disability policy underwritten by ICNA. National Life's
group policy included a "conversion clause" that permitted employees
to convert from group disability coverage to individual policies
when their employment with National Life came to an end. Demars
initially enrolled in the group disability policy. In 1990, when
she left National Life, she elected to convert her group coverage
to an individual ICNA policy.
 ICNA's conversion application consisted of two pages. 
The first page, to be filled out by the applicant, asked for
general information. The second page was to be completed by
Demars's employer. Since Demars had already left National Life,
she considered her employer to be Demars Financial Services, Inc.,
a business that she and her husband ran. Accordingly, in response
to a question about her earnings at the time of termination, she
did not report her final National Life salary; instead, she
reported the gross annual commissions she earned as an employee of
Demars Financial Services. 
 In August 1990, ICNA notified Demars that her application
had been approved, sent her a certificate of insurance for the
conversion policy, and requested an initial premium payment. 
Demars paid the initial premium and the quarterly premiums
thereafter.
 In November 1993, Demars filed a claim with ICNA for long
term disability benefits. Her claim was approved in April 1994,
and ICNA commenced monthly payments of $1,972 ($3,000 less Social
Security disability benefits) in May 1994.
 In March 1997, CIGNA requested that Demars forward
financial information pertaining to the years 1990 through 1996. 
After examining this information, CIGNA concluded that Demars had
incorrectly reported her income on the conversion application, that
she was actually entitled only to a $100 minimum monthly benefit,
and that ICNA had therefore overpaid her by more than $70,000
between May 1994 and June 1997. CIGNA sent Demars a letter dated
June 26, 1997 that explained these conclusions and informed her
that CIGNA would withhold all further monthly benefit payments (now
set at $100) until she had repaid the sums allegedly owed. Demars
has not received any benefit payments since that date.
 Rather than repaying CIGNA the allegedly excessive
benefits and accepting the reduction in future benefits, Demars
brought suit against CIGNA and ICNA, asserting both diversity and
federal question jurisdiction. After Demars stipulated to the
dismissal of her ERISA claim and the district court granted the
defendants' motion to dismiss her state law claims, judgment was
entered against Demars, who now appeals.
 II We review de novo the legal question whether ERISA
preemption applies to claims arising from a conversion policy, seeDegnan v. Publicker Indus., Inc., 83 F.3d 27, 29 (1st Cir. 1996),
and begin with the words of the statute. Section 1144(a) states
that ERISA provisions "shall supercede any and all State laws
insofar as they may now or hereafter relate to any [ERISA] employee
benefit plan." 29 U.S.C. 1144(a). 
 We note at the outset that Demars's state law claims
clearly "relate to" her conversion policy in the sense intended by
 1144(a), since in order to prevail on those claims Demars would
need to prove the existence of, or specific terms of, the
conversion policy. See Ingersoll-Rand Co. v. McClendon, 498 U.S.
133, 140 (1990) (stating "relates to" test); see also McMahon v.
Digital Equip. Corp., 162 F.3d 28, 38-39 (1st Cir. 1998) (applying
Ingersoll-Rand test to breach of contract and unfair trade practice
claims). 
 Defendants would like us to complete the analysis by
asking "whether the conversion policy is sufficiently connected
to[] (or related to) the underlying ERISA plan." They argue that
the conversion policy and the ERISA plan are clearly "connected" or
"related" to each other, since Demars obtained the conversion policy
by virtue of rights granted by National Life's group disability
benefits plan. We do not disagree with this point; there is
obviously a type of "but for" relationship linking Demars's
conversion policy and National Life's ERISA plan. But "infinite
relations cannot be the measure of pre-emption." New York State
Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
514 U.S. 645, 656 (1995). If a chain of "relates to" links could
establish ERISA preemption, then ERISA preemption and ERISA
regulation could be separated in an anomalous way. The proper
question to ask under 1144(a) is not whether Demars's claims
relate to her conversion policy, which relates in turn to an ERISA
plan, but rather whether the conversion policy is itself subject to
ERISA regulation as an ERISA plan.
 The statute defines an "employee welfare benefit plan"
(the type of ERISA plan at issue here, see 29 U.S.C. 1002(3)) as:
 any plan, fund, or program which was heretofore or is
 hereafter established or maintained by an employer . . .
 for the purpose of providing for its participants or
 their beneficiaries, through the purchase of insurance or
 otherwise, . . . benefits in the event of sickness,
 accident, disability, death or unemployment. 

29 U.S.C. 1002(1). 
 This nearly tautological definition offers little
guidance. The key phrase for present purposes is "established or
maintained by an employer." Demars's conversion policy was
certainly "established" in some sense by her former employer -- but
was it "established" in the relevant sense? Case law provides no
definitive answers. "[N]o single act in itself necessarily
constitutes the establishment of the plan, fund, or program,"
Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982) (en
banc), quoted in Belanger v. Wyman-Gordon Co., 71 F.3d 451, 455
(1st Cir. 1995), and "[t]here is no authoritative checklist that
can be consulted" to determine whether an employer's actions
establish an ERISA plan, Belanger, 71 F.3d at 455.
 In passing ERISA, Congress's purpose was twofold: to
protect employees and to protect employers. See McMahon, 162 F.3d
at 35-36. Congress wanted to safeguard employee interests by
reducing the threat of abuse or mismanagement of funds that had
been accumulated to finance employee benefits, see Fort Halifax
Packing Co. v. Coyne, 482 U.S. 1, 15 (1987), while at the same time
safeguarding employer interests by eliminating "the threat of
conflicting and inconsistent State and local regulation" of
employee benefit plans, Travelers, 514 U.S. at 657 (quoting 120
Cong. Rec. 29197 (1974)).
 Neither concern seems to be strongly implicated here. 
There is little threat of abuse of funds in the ERISA sense. While
there is a risk that funds accumulated to finance benefits under
the conversion policy could be mismanaged or abused, there is no
risk of Demars's former employer abusing or mismanaging these
funds, since it does not control them, or indeed have any tie to
them. Rather, it is the insurers who issued the policy --
defendants here -- who are in a position to possibly abuse or
mismanage the funds. Yet Congress placed into ERISA an express
disavowal of any intent to regulate insurers qua insurers. See 29
U.S.C. 1144(b)(2).
 The uniformity of regulations concern is equally
attenuated. While conversion policies like Demars's undoubtedly
impose an administrative burden, that burden lies on the insurers
who provide the policy, not on the former employer. As Fort
Halifax noted, "Congress intended pre-emption to afford employers
the advantages of a uniform set of administrative procedures
governed by a single set of regulations. This concern only arises
. . . with respect to benefits whose provision by nature requires
an ongoing administrative program to meet the employer's
obligation." Fort Halifax, 482 U.S. at 11. Thus, "an employee
benefit may be considered a plan for purposes of ERISA only if it
involves the undertaking of continuing administrative and financial
obligations by the employer." Belanger, 71 F.3d at 454. Under
this analysis, conversion policies are not ERISA plans, because
employers do not bear any administrative or financial
responsibility for them.
 Defendants argue that there is a residual uniformity
interest affecting employers. They point out that if different
states can regulate conversion policies, then there will be
differential costs associated with the provision of conversion
policies in the different states. These differential costs could
drive up the costs of granting conversion rights and thus reduce
the incentive of employers with employee welfare benefit plans to
grant those rights. This may or may not be true, but it does not,
in any event, argue for ERISA preemption of state law claims
relating to conversion policies. That is because "cost uniformity
was almost certainly not an object of [ERISA] pre-emption." 
Travelers, 514 U.S. at 662. ERISA preemption was intended to
guarantee regulatory uniformity, not intrastate or interstate cost
uniformity. See id. (rejecting argument that ERISA demands the
equalization of "relative costs of various health insurance
packages in a given state"); De Buono, 520 U.S. at 816 (noting that
ERISA does not attempt to equalize the cost of benefits across
states). 
 Other arguments bolster the conclusion that conversion
policies are not subject to ERISA. A Department of Labor
regulation interpreting the term "employee welfare benefit plan,"
while not directly on point, provides a useful analogy. Section
2510.3-1(j) creates a "safe harbor" for certain "group or group-type
insurance programs": a group or group-type insurance program
offered by an employer will not be considered to be an employee
welfare benefit plan if the employer does not make contributions to
and receives no consideration from the insurer, employee
participation in the program is voluntary, and the employer's sole
functions are to permit the insurer to publicize the program to
employees and to collect and remit premiums to the insurer. See 29
C.F.R. 2510.3-1(j) (1998). The regulation is not directly
applicable to Demars's conversion policy, since hers is not a group
policy or even a "group-type" policy, and since granting a
conversion right is not identical to "publicizing" an insurance
program. But the logic of ERISA suggests that a conversion policy
like Demars's would be even more securely anchored in a safe harbor
than the type of policy addressed by 2510.3-1(j), since her
policy does not require any ongoing employer involvement.
 Moving from analogy to contrast, the "continuation
coverage" mandated by the Consolidated Omnibus Budget
Reconciliation Act ("COBRA"), 29 U.S.C. 1161 et seq., provides an
instructive counterpoint to the conversion policy considered here. 
COBRA amended ERISA in 1985 to require employers to permit an
employee to continue group coverage for up to eighteen months after
termination of employment, if the employee elects to do so and
agrees to reimburse the employer for up to 102% of the average per-
employee cost of that group coverage. See 29 U.S.C. 1162. 
Unlike coverage under a conversion policy, COBRA continuation
coverage does place ongoing administrative burdens on the employer
(since the ex-employee continues to belong to the employer's group
plan), as well as ongoing financial obligations (since COBRA
coverage may in fact cost the employer more than the permitted
reimbursement amount). Given employers' ongoing administrative and
financial involvement, courts have found that claims related to
COBRA coverage are preempted by ERISA. See Mimbs v. Commercial
Life Ins. Co., 818 F. Supp. 1556, 1560-61 (S.D. Ga. 1993)
(explaining why COBRA continuation coverage is subject to ERISA
regulation).
 Certain practical concerns -- not present in the COBRA
context -- also suggest that state law claims related to conversion
policies should not be preempted by ERISA. Consider, for example,
the effect on insurers if conversion policies were found to be
ERISA plans: as ERISA plan administrators, insurers would be
required to file plan descriptions and detailed annual reports with
the Department of Labor, see 29 U.S.C. 1023, 1024, and to
provide regularly updated plan summaries to the plan beneficiaries,
see 29 U.S.C. 1022. Given the individual nature of the typical
conversion policy, the insurer would presumably be required to meet
these extensive requirements separately for each individual
conversion policy. An even more unwarranted outcome would result
if former employers, rather than insurers, were deemed to be ERISA
plan administrators for conversion policies, since employers would
then have to meet ERISA's reporting and disclosure requirements for
all of the policies issued, perhaps by a bevy of different
insurers, to an ever-growing collection of difficult-to-locate
former employees. 
 Finally, many other courts appear to agree with our
conclusion regarding the status of conversion policies, although
the compatibility of certain decisions is apparent only upon close
reading. A small set of decisions clearly reach the contrary
conclusion -- but based, we believe, on unpersuasive reasoning.
 Several district courts have adopted the careful
distinction between conversion rights and conversion policies that
we drew at the outset and that was first drawn in Mimbs. Mimbsfound that state law claims involving the right to convert are
preempted by ERISA, but that claims related to the conversion
policy itself are not. See Mimbs, 818 F. Supp. at 1561-62 (finding
that "[a]ny claim that Defendant failed to offer proper conversion
plan options . . . relates to the ERISA plan and is pre-empted by
ERISA," but that "[t]he concerns behind ERISA pre-emption are not
implicated by state-law claims arising from obligations incurred
under the conversion policy itself"); see also Barringer-Willis v.
Healthsource North Carolina Inc., 14 F. Supp. 2d 780, 783-85
(E.D.N.C. 1998) (adopting Mimbs distinction); Mizrahi v. Provident
Life and Accident Ins. Co., 994 F. Supp. 1452, 1453-54 (S.D. Fla.
1998) (same); Powers v. United Health Plans of New England, Inc.,
979 F. Supp. 64, 69-70 (D. Mass. 1997) (same); Loudermilch v. New
England Mut Life Ins. Co., 942 F. Supp. 1434, 1437 (S.D. Ala. 1996)
(same); McCale v. Union Labor Life Ins. Co., 881 F. Supp. 233, 235-
36 (S.D. W. Va. 1995) (same); Vaughn v. Owen Steel Co., 871 F.
Supp. 247, 249 (D.S.C. 1994) (same).
 The Second Circuit and the Fourth Circuit have agreed
with the first half of the Mimbs rule -- that state law claims
related to conversion rights are preempted by ERISA -- without
deciding whether ERISA regulation extends to conversion policies. 
See White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 28
(4th Cir.), cert. denied, 118 S. Ct. 369 (1997); Howard v. Gleason
Corp., 901 F.2d 1154, 1157-58 (2d Cir. 1990).
 The Ninth Circuit has spoken less clearly on this
question. One Ninth Circuit decision obviously concerned only the
right to convert, see Tingey v. Pixley-Richards West, Inc., 953
F.2d 1124, 1132-33 (9th Cir. 1992), while a subsequent decision,
Greany v. Western Farm Bureau Life Insurance Co., 973 F.2d 812 (9th
Cir. 1992), has proven far more difficult to interpret. The
dispute underlying Greany arose when an employee was mistakenly
told that his group health insurance would terminate on a date
later than it actually did, causing a gap between his group
coverage and the conversion coverage he obtained. See id. at 814-
15. The insurer quickly admitted its mistake and permitted the
employee to convert his policy retroactively to the actual date of
termination of the group policy. See id. Since the employee had
already received the full amount due to him under the conversion
policy, none of his panoply of claims against his former employer
and the insurer sought benefits under that policy. See id. at 815. 
The relevant portions of Greany merely apply the first part of the
Mimbs rule, finding state law claims related to conversion rights
to be preempted by ERISA. See, e.g., id. at 818 (rejecting a
negligence count against the employer for its actions in procuring
the conversion policy because conversion rights are subject to
ERISA regulation).
 Greany is nevertheless cited for the proposition that
conversion policies themselves are subject to ERISA regulation and
preemption. See, e.g., White, 114 F.3d at 28; Glass v. United of
Omaha Life Ins. Co., 33 F.3d 1341, 1346 (11th Cir. 1994). This
seems to us to be a misreading of Greany -- an understandable
misreading in light of two problematic aspects of the opinion. 
First, the opinion uses confusing language to refer to conversion
rights. Compare Greany, 973 F.2d at 817 (referring repeatedly to
"conversion benefits"), with id. at 823 (summarizing holding as one
regarding "conversion rights"). Second, Greany discusses the
plaintiffs' unfair claims settlement practices claim without making
clear that this claim was for benefits under the group policy, not
the conversion policy. See id. at 819. Because the opinion does
not make this point clear, and because of its misleading use of the
phrase "conversion benefits" to refer to conversion rights, it has
been incorrectly interpreted -- and "headnoted" -- as a decision
about whether conversion policies are subject to ERISA regulation.
 Some decisions have squarely held that ERISA regulation
extends to conversion policies, but we do not find their reasoning
persuasive. Several courts, for example, have assumed that ERISA
regulation must extend to conversion policies based on an argument
similar to the "relates to" argument rejected above, while failing
to consider whether conversion policies implicate any of ERISA's
underlying purposes. See, e.g., Painter v. Golden Rule Ins. Co.,
121 F.3d 436, 439-40 (8th Cir. 1997) ("[T]he Conversion Policy came
into being as a result of Painter exercising her right under the
group policy to obtain this specific insurance policy. . . . As
such, the Conversion Policy is a component of [the employer's]
ERISA plan."), cert. denied, 118 S. Ct. 1516 (1998); Beal v.
Jefferson-Pilot Life Ins. Co., 798 F. Supp. 673, 675 (S.D. Ala.
1992) ("[P]laintiffs' right to the converted policy as well as a
designation of the benefits to be contained therein existed solely
by virtue of an ERISA employee benefit plan. . . . The Court . . .
finds that the policy at issue is an 'employee benefit plan' under
ERISA." (citation and internal quotation marks omitted)).
 A faulty analogy to COBRA coverage led the Sixth Circuit
to decide that a certain type of conversion policy must be subject
to ERISA. See Massachusetts Casualty Ins. Co. v. Reynolds, 113
F.3d 1450, 1453 (6th Cir. 1997). The employer in Reynolds had
provided ERISA-governed benefits to its employees by purchasing
individual disability insurance policies for them. See id. 
Reynolds's individual conversion policy was therefore essentially
the same policy he had had while an employee, except that after
conversion it was Reynolds, rather than the employer, who was
responsible for paying the premiums and maintaining a relationship
with the insurer. See id. at 1452. 
 The Reynolds court found it critical that Reynolds did
not switch from group to individual coverage and that the terms of
his policy remained the same; these facts, said the court, made
Reynolds's conversion coverage akin to COBRA continuation coverage. 
See id. (citing Mimbs's discussion of COBRA). But the court's
conclusion fails to reflect the actual logic behind ERISA
regulation of COBRA continuation coverage. COBRA coverage is not
subject to ERISA regulation merely because the terms of the
coverage "continue" the specific terms of the employer's ERISA plan;
rather, COBRA coverage is subject to ERISA regulation because it
implicates both of ERISA's cardinal purposes.
 The Eleventh Circuit also, we believe, misread Mimbs when
it held in Glass v. United of Omaha Life Insurance Co., 33 F.3d
1341 (11th Cir. 1994), that a conversion policy that provided
coverage to a group of ex-employees was "distinguishable from Mimbsin this respect," id. at 1346, and therefore subject to ERISA
regulation. The court reasoned:
 The conversion in the instant case, unlike that in Mimbs,
 did not actually create an individual policy. It removed
 [the employee's] coverage from a group policy consisting
 of actively employed Silk Greenhouse employees and moved
 the coverage to a group policy of ex-Silk Greenhouse
 employees. . . . Clearly, [the employee's] ability to
 obtain the converted life insurance policy arose from the
 ERISA plan, and the converted policy itself continued to
 be integrally linked with the ERISA plan. In this case,
 conversion . . . did not defeat ERISA regulation.

Id. at 1346-47. By attempting to distinguish between group and
individual conversion policies, the Glass decision misunderstands
the logic of Mimbs. Both types of conversion policy fall outside
the reach of ERISA, since what matters for ERISA purposes is not
the nature of the conversion policy but rather the nature of the
employer's ongoing administrative and financial ties to the policy. 
If no such ties exist, the policy should not be subject to ERISA
regulation.
 Finally, we note our disagreement with another frequently
cited decision holding that conversion policies are subject to
ERISA. The court in Nechero v. Provident Life & Accident Insurance
Co., 795 F. Supp. 374 (D.N.M. 1992), also focused on the issue that
we consider central: the extent to which conversion policies
implicate ERISA's purpose of shielding employers from inconsistent
state regulations. See id. at 378-79. However, contrary to what
we have concluded, the Nechero court found that conversion policies
do place a significant administrative burden on employers, because
these policies require the employer to "track[] the insurance
expiration of departing employees, timely inform[] them of their
conversion option, and assist[] in their conversion to an
individual policy if they so choose. [The employer's] involvement
is ongoing as to its employees as a whole, and requires an
administrative scheme." Id. at 379. 
 We agree that the administrative burdens noted in Necheroare real. Yet because these burdens are all tied to the conversion
right, rather than the conversion policy, they do not support the
conclusion that conversion policies are subject to ERISA
regulation. In the end, the reasoning in Nechero supports the
distinction recognized in Mimbs between conversion rights, which
are subject to ERISA, and conversion policies, which are not.
 III
 We hold that Demars's conversion policy is not an
"employee welfare benefit plan" and that Demars's state law claims
relating to the conversion policy are not preempted under
 1144(a). We express no opinion, of course, as to the merits of
Demars's claims against CIGNA and ICNA.
 Reversed and remanded. Costs to appellant.