Stanley A. RODOWICZ, et al.,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, et al.

Civil Action No. 93–31175–MAP.

United States District Court, D. Massachusetts.

April 24, 1998.

Keith A. Minoff, John C. Sikorski, Robinson, Donovan, Madden & Barry, Springfield, MA, for Stanley A. Rodowicz, James J. Lemon, Sigmund S. Ziemba, Barbara Binsky, Patricia A. Kennedy, Anne E. Buck, June Devine, Margaret S. Stevens.

John C. Sikorski, Robinson, Donovan, Madden & Barry, Springfield, MA, for Gladys G. Faniel.

David G. Cohen, Charles S. Cohen, Egan, Flanagan & Cohen, PC, Springfield, MA, for Massachusetts Mutual Life Insurance Company.

## MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(Docket No. 112)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiffs, all former employees of the defendant Massachusetts Mutual Life Insurance Company ("MassMutual"), seek damages on theories of misrepresentation, breach of the covenant of good faith and fair dealing, and promissory and equitable estoppel. In essence, plaintiffs claim that defendant misled them by failing to reveal that a retirement plan providing enhanced benefits was under consideration. As a result, the plaintiffs retired early and lost eligibility for substantially increased retirement benefits.

For the reasons set forth in more detail below, the defendants' Motion for Summary Judgment will be allowed. While the law may have been unclear at the time this suit was filed, the applicable rules have now come into focus, rendering manifest the inadequacy of the facts of record to support any claim here. See Vartanian v. Monsanto Co., 131 F.3d 264 (1st Cir.1997). Put simply, the undisputed facts of record confirm that, as a matter of law, no enhanced retirement plan was under "serious consideration" at the time plaintiffs made their inquiries. Thus, despite Herculean efforts by plaintiffs' counsel, defendants are entitled to judgment.

### II. PROCEDURAL BACKGROUND

This case has followed an unusually twisted, and lengthy, path due in part to the evolving nature of the law in this area. In order to understand the current form of the plaintiffs' claims for relief, it is necessary to trace the metamorphosis of the litigation in some detail.

The complaint as originally filed set forth counts for violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., and for common law negligent misrepresentation. Docket No. 1 at ¶¶ 13–15. The case was originally drawn to Senior Judge Frank H. Freedman.

On March 14, 1994, the case was reassigned to this court.

In response to the complaint, the defendants filed a Motion to Dismiss, offering three arguments: first, that plaintiffs were not "participants" in the 1992 retirement plan they sought to enforce and, therefore, had no standing to bring an action under ERISA; second, that the complaint failed to offer facts supporting the misrepresentation claim with the level of particularity required by Fed.R.Civ.P. 9(b); and, third, that all plaintiffs' common law claims were preempted by ERISA. In response to the motion, plaintiffs filed not only an opposition but a motion to amend, seeking to add one more theory under ERISA and twelve additional common law counts.

On July 27, 1994, this court issued a Memorandum mainly denying the defendants' motion to dismiss the ERISA claims,[1] and allowing the motion to dismiss the misrepresentation claim on the ground of preemption. In addition, the court allowed the plaintiffs' motion to amend to add an additional theory under ERISA, but denied the plaintiffs' motion to add any common law counts on the ground of futility, since at that time the court was of the view that any common law causes of action were preempted by ERISA.

On August 16, 1994, plaintiffs filed an amended complaint. Again, the defendants sought dismissal and also moved to strike the jury demand.

On March 31, 1995, this court issued a Memorandum, both in this case and another raising similar issues. In the Memorandum, the court denied the Motion to Dismiss, except as to two of the plaintiffs, but allowed the defendants' motion to strike claims for compensatory and punitive damages and to strike the jury demand. In denying the Motion to Dismiss, the court rejected defendants' argument that the averments of the complaint only set forth allegations of misrepresentation of business decisions.

Following a pretrial conference on April 25, 1995, the defendants filed a Motion for Summary Judgment and the plaintiffs filed a Cross-motion for Partial Summary Judgment on liability on July 20, 1995. On November 1, 1995, the court heard argument on these motions.

On December 19, 1995, the court issued an order requiring the parties to submit supplemental memoranda regarding the applicability of the First Circuit's decision in *Belanger v. Wyman–Gordon Co.*, 71 F.3d 451 (1st Cir. 1995).

On February 12, 1996, the court, applying *Belanger*, concluded that the MassMutual severance plan at issue did not constitute an "employee benefit plan" within the meaning of ERISA. The court therefore, *sua sponte*, dismissed all ERISA claims in the complaint. This action threatened a potentially anomalous result: dismissal of the common law claims based on ERISA preemption, and dismissal of ERISA claims based upon the *Belanger* decision. To avoid this unfairness, the court allowed the plaintiffs' Motion to Reconsider its earlier ruling dismissing the common law claims and reinstated the plaintiffs' claim of common law misrepresentation.

Following a case management conference, the plaintiffs moved to reinstate their jury demand, to reopen discovery and to file a third amended complaint. Defendants moved for reconsideration of the court's ruling dismissing the ERISA claims or, alternatively, for an interlocutory appeal or for entry of separate judgment to permit an appeal.

On July 18, 1996, the court allowed the plaintiffs' motions to reinstate the jury demand, to reopen discovery, and to file a third amended complaint. At the same time, the court denied the defendants' Motion for Reconsideration, for Interlocutory Appeal and for Entry of Separate Judgment.[2] The third

---

1. The motion was allowed with regard to four plaintiffs, but without prejudice to the filing of a properly supported amended complaint setting forth adequate facts to support their claims.

2. It remains this court's view that, on the facts of this case, *Belanger* requires dismissal of plaintiffs' ERISA claims, since defendant's 1992 Voluntary Termination Program ("VTP") did not constitute an "employee benefit plan" under the statute. This issue is probably moot, however. *Vartanian* mandates entry of summary judgment because the VTP, whatever its nature, was not under "serious consideration" at the time plaintiffs made their inquiries. The record thus fails to support either a claim under ERISA or under the common law.

amended complaint is now the operative document before the court.[3] As noted above, this complaint presents solely common law claims for misreprentation, violation of the covenant of good faith and fair dealing, and both promissory and equitable estoppel.

### III. FACTUAL BACKGROUND

For purposes of this Motion for Summary Judgment the court will, of course, view the facts in the light most favorable to the plaintiffs and draw all reasonable inferences in their favor.

Although defendants do dispute some facts, particularly plaintiffs' allegations that they were told certain things by defendants' employees, little dispute exists with regard to the factual template to be used for purposes of this motion. Indeed, much of the factual background of this case has previously been recited in the court's earlier memorandum. See Rodowicz v. MassMutual Life Insurance Co., 857 F.Supp. 992 (D.Mass.1994).

The relevant events begin in 1990, when defendant MassMutual began to be concerned about what has been characterized as executive "gridlock." The flow of senior executive retirements was insufficient, it was felt, to open up space for promotions from below. To address this, a 1990 Voluntary Incentive Program ("VIP") was drafted in detail. Although it never was adopted, the plan's documents were specifically saved by MassMutual for possible use at a later date. A jury could reasonably find that, although the VIP was not put into effect in 1990, concerns about overstaffing remained.

In the summer of 1991, Moody's Investors Service, Inc. and Standard & Poor's lowered their ratings of MassMutual products. This was the first time that a ratings agency had ever lowered MassMutual's ratings. Plaintiffs contend that this downgrade caused "seismic waves to rumble through Company headquarters." Plaintiffs' Memorandum in Opposition (Docket No. 119) at 3. Certainly, a jury could conclude that this first-time action by the ratings agencies was a matter of great concern to the company.

The ratings downgrade took place in a national atmosphere of economic disruption, particularly in the insurance industry. The National Association of Insurance Commissioners ("NAIC") was developing new "risk based capital" rules intended to assess the adequacy of an insurer's capital as compared to the viability of its investment portfolio. The rating agencies, in lowering the ratings of MassMutual products, noted particular concern about MassMutual's overexposure to real estate investments, particularly in the Northeast.

It is reasonable to conclude that in this volatile atmosphere, MassMutual, along with other insurance companies, was looking at measures it could take to lower expenses. Employee salaries made up the largest single category of cost for MassMutual. It is undisputed that by the end of 1991, senior executives at MassMutual were examining staffing levels to determine whether they could be lowered. It is also undisputed that, after considering the possibility, MassMutual made a determination *not* to reduce its workforce at that time.

In February 1992, MassMutual's chief executive officer, Thomas Wheeler, gave a speech to company employees stating, in essence, that MassMutual was in good financial condition. He made no reference to any reduction in the work force.

Wheeler's speech was reported in *MassMutual News*, an internal company newsletter, on February 14, 1992. This report presented an optimistic picture of the company's future and quoted Wheeler as stating: "There will be no change in how we do business. We are a company with integrity. We handle our business ethically and are better than our competitors." *MassMutual News*, Vol. 33, No. 7, p. 2 (Cohen Decl., Ex. 1).

Several of the plaintiffs, who were considering retirement and who were attempting to discern whether there might be an enrichment of the company's pension package, inferred from these remarks that there would be no reduction in force at MassMutual and

---

**3.** Technically, a fourth amended complaint has been filed, but only seeks to substitute an administratrix for a previously-named party. The substance of plaintiffs' claims remains as set forth in the Third Amended Complaint.

therefore no enhanced retirement package offered.

In March 1991, John J. Pajak, MassMutual's Chief Operating Officer, assigned senior members of his management team the task of reviewing data with the goal of estimating the cost and savings involved in a possible reduction in force. Defendants and plaintiffs have put contrasting rhetorical spins both on the stature of the employees engaged in this review and on the substance of the review itself. Defendant characterizes the personnel involved in the effort as "junior MassMutual employees," while plaintiffs argue that they were "rising stars, being guided to the top of the company." Defendants point out that most of the individuals performing the study were new to their positions; plaintiffs highlight the fact that these individuals have gone on to top executive slots.

It is undisputed that Susan Alfano, Senior Vice President in Charge of Human Resources, did garner data from Mercer & Company, MassMutual's outside employee benefits consultant. Alfano reworked the Mercer & Company numbers based on her own in-depth personal knowledge of the employees at MassMutual in order to perform a thorough analysis of the possible costs and benefits of a reduction in force. This analysis occurred in the months between March and September 1992.

On September 17, 1992, Wheeler reviewed MassMutual's five-year budget with Pajak and another senior executive. Wages and salaries were discussed at this review, and Wheeler asked Pajak to develop options for reductions in force. Wheeler instructed Pajak to "dust off" the review that was done in 1991.

Pursuant to Wheeler's instructions, on September 30, 1992, Pajak and Alfano made a presentation to the president's Cabinet. The essence of their recommendation was that MassMutual should assess the possibility of a two-step reduction in force, comprising a first stage voluntary severance program and a second-stage involuntary lay-off, to be completed by early 1993. Following this presentation, Pajak and Alfano were instructed to develop the details of such a program for further consideration. It is undisputed that, prior to October 1, 1992, no possible reduction in force had ever been presented to, or even discussed by, MassMutual's Board of Directors.

The VTP contemplated a 7% reduction in force. MassMutual had never had such a reduction in force in its history.

As of September 17, 1992, only two of the plaintiffs were still working at MassMutual and a third, though not working, had sixty days of vacation left, which he could have taken in order to push his eligibility into the applicable time period. However, it is also undisputed that none of these three employees made any inquiries after September 17, 1992 regarding the possibility of a sweetened retirement package.

Following the September 30, 1992 action by the President's Cabinet, senior MassMutual employees began developing the specifics of a possible program. By October 12, 1992, the terms of the VTP were drafted, and the Compensation Committee of MassMutual's Board of Directors for the first time authorized Wheeler to adopt the plan at his discretion. On October 19, 1992, Wheeler made the decision to go forward with the plan. The precise terms of the VTP plan documents were not placed in final form or signed until mid-November 1992.

All of the named plaintiffs retired from MassMutual between August 1, 1992 and October 1, 1992. On October 23, 1992, MassMutual announced its early retirement incentive program, called the Massachusetts Mutual Life Insurance Company Voluntary Termination Program (the "VTP" or "1992 Plan"). The VTP provided three weeks pay for every year of service, up to a maximum of 78 weeks. Only employees who retired *on or after* October 23, 1992 and *before* January 2, 1993 were eligible to receive benefits under this severance package. It is undisputed that all the plaintiffs in this case would have received substantially higher retirement benefits if they had waited until after October 23, 1992 to retire.

The misrepresentations relied upon by the individual plaintiffs are set out specifically in the defendants' Memorandum in Support of its Motion for Summary Judgment, and are

not disputed by the plaintiffs. In essence, they are as follows.

Plaintiff Binsky alleges that in or around April 1992 she inquired of Byron Mattson, a senior officer of the company, regarding an early retirement incentive and he stated, in substance, "absolutely not, there will be no golden handshake." A retirement counselor, Priscilla Dill, informed Binsky, "I really don't think there will be anything."

Plaintiff Buck claims that in July 1992 Dill informed her that "I'm not aware of anything coming down the road." She claims that in May 1992 she was told by Michael Walker, a former supervisor, that "anything can happen, but we have no definite plans."

Plaintiff Kennedy alleges that in the spring of 1992 she was present when her supervisor, Linda Egan, stated at a departmental meeting that there would not be any severance program or early retirement incentive program.

Plaintiff Lemon alleges that in the summer of 1992 he attended a retirement meeting at which it was announced that there would be no enhanced benefit package.

Lead plaintiff Rodowicz claims that in late August or early September 1992 he was told by Laura Cowles, an employee in Corporate Human Resources, that the Board of Directors had decided that there would be no changes in the retirement package. According to Rodowicz, Cowles was emphatic about this.

Plaintiff Stevens alleges that in April 1992 she was told by a retirement counselor, Pat Ogoley, that Ogoley did not know whether there would be any early retirement incentives. At some other point another retirement counselor, Lois DeGray, denied that there would be any enhanced benefit package or "golden handshake."

Plaintiff Ziemba alleges that in the spring of 1992 he ran into Robert Pouliot, a senior officer of the defendant, in a hallway and inquired whether Pouliot knew about an enhanced retirement package. Pouliot responded that he did not know, but he had heard no such thing.

Plaintiff Faniel contends that in March of 1992 and at an undated second meeting he spoke to Dill, who told him, in response to a general inquiry about possible changes at the company, in effect, "I don't know, I don't think so, I haven't heard anything."

In addition, all plaintiffs contend that they were misled by Wheeler's statements quoted in the February 1992 *MassMutual News* to the effect that MassMutual was in good financial condition and there would be "no change" in the company's course.

## IV. DISCUSSION

For reasons set forth below, this case, although technically advanced under theories of common law, is controlled by the body of decisions governing lawsuits under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"). The First Circuit's recent decision in *Vartanian v. Monsanto Company*, 131 F.3d 264 (1st Cir.1997), which had not been handed down at the time counsel submitted their briefs, bears most directly on the issues raised by defendants' Motion for Summary Judgment. *Vartanian* will therefore provide the springboard for discussion.

The facts in *Vartanian* were virtually identical in all pertinent respects to the facts presented by this case. In *Vartanian*, the defendant Monsanto's business had been suffering during 1990 and 1991, and rumors were circulating that the company was considering an early retirement program. In the first quarter of 1991, Robert Potter, Monsanto's president, started discussing various proposals to cut costs, including the closing of several plants. In addition, the Vice President of Finance prepared an estimate for the cost of severance benefits to certain employees.

In March 1991, Vartanian asked his immediate supervisor about a possible sweetened early retirement plan and was told that none was under contemplation. In April 1991, as rumors continued to fly, Vartanian contacted his supervisor once more and followed up this discussion with a personnel officer. Both told him they were unable to confirm the rumors, and they did not personally believe that any early retirement package was in the works.

Meanwhile, between April 21 and May 1, 1991, the Monsanto Management Board met a number of times, ultimately recommending the closure of six plants. No presentation was made concerning early retirement incentives and no document or written proposal for a severance plan was prepared. Vartanian retired on May 1, 1991.

On May 16, 1991, the Director of Employee Benefits was asked to develop a severance program and, later that month, he met with a corporate vice president to discuss a specific severance plan. On June 2, 1991, Monsanto's Executive Management Committee formally endorsed the idea of a company-wide early retirement program. The plan was finalized on June 27, 1991, and approved by Monsanto's Board of Directors on June 28, 1991. Because of his retirement on May 1, 1991, Vartanian lost $174,700 in pension benefits.

Based upon these facts, this district court allowed the defendant's Motion for Summary Judgment. The basis for the ruling was the court's conclusion that the undisputed facts of record could not support a conclusion by any reasonable factfinder that the adoption of an enhanced benefit plan was under "serious consideration" as that phrase was construed by the Third Circuit in *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997). With regard to proposed plans for enhanced retirement benefits, the *Fischer* court held that "serious consideration" occurs when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id.* at 1539.

In affirming the district court's opinion, the First Circuit in *Vartanian* explicitly adopted the Third Circuit's standard, modifying it only slightly.

We thus conclude, modifying *Fischer II*, that serious consideration of a change in plan benefits exists when (1) a specific proposal which would affect a person in the position of the plaintiff (2) is being discussed for purposes of implementation (3)

by senior management with the authority to implement that change.

*Vartanian*, 131 F.3d at 272.

The First Circuit's explicit adoption of the *Fischer* factors in weighing the issue of "serious consideration" has eliminated a number of the arguments offered by the plaintiffs in opposition to the Motion for Summary Judgment. For example, plaintiffs argued that the *Fischer* decision emerged only after a trial and detailed findings of fact. Like the *Fischer* plaintiffs, plaintiffs said, they were entitled to a jury trial. *Vartanian*, however, affirmed the District Court's allowance of the Motion for Summary Judgment without trial.

■ Plaintiffs' primary argument is that, because they are asserting common law causes of action rather than ERISA, a different standard should apply, entitling them to a jury trial.

■ Both sides rely on *Zimmerman v. Kent*, 31 Mass.App.Ct. 72, 575 N.E.2d 70 (1991), for the common law elements of misrepresentation. To prevail, plaintiffs must prove a false statement of material fact, made to induce the plaintiffs to act, and reasonable reliance upon the false statement by the plaintiffs to their detriment. *Id.* at 77, 575 N.E.2d 70. It is well established that, under Massachusetts law, the plaintiffs "need not prove that [the] speaker knew his statement to be false." *Id.* at 81, 575 N.E.2d 70.

Here, plaintiffs are simply unable to boost the facts of record over this legal hurdle. The undisputed facts confirm that no employee of the defendant, knowingly or unknowingly, conveyed a false statement of any kind, let alone one of *material* fact, to the plaintiffs to induce them to act.

■ Plaintiffs and defendants agree that the definition of "material" is the same under both federal law and the law of the Commonwealth of Massachusetts. Materiality is "defined as whether 'a reasonable man would attach importance [to the facts not disclosed] in determining his choice of action in the transaction in question.'" *Zimmerman*, 31 Mass.App.Ct. at 78 (quoting *Rogen v. Ilikon Corp.*, 361 F.2d 260, 266 (1st Cir.1966) (bracketed material in original)). Indeed, in

*Fischer* itself the Third Circuit noted the conflation of the federal standard governing claims for misrepresentation with the common law rubric.

> In the current case, *as in any case where the misrepresentation in question is the statement that no change in benefits is under consideration,* the only factor at issue is the degree of seriousness with which the change was in fact being considered. This factor controls the materiality test: "[T]he more seriously a plan change is being considered, the more likely a misrepresentation ... will pass the threshold of materiality."

*Fischer,* 96 F.3d at 1538 (citations omitted) (emphasis supplied).

■ The determination of materiality for purposes of a claim under the common law thus involves the same standard developed by the Third Circuit in *Fischer* and adopted by the First Circuit in *Vartanian.* Misrepresentations with regard to enhanced benefit plans become material *only* when enhanced benefit plans are under "serious consideration."

The first problem plaintiffs face is that (with the possible exception of the Wheeler speech in February 1992, which will be addressed below), plaintiffs cannot point to even arguable misrepresentations of *any* sort, material or otherwise, made to them by MassMutual employees. The record does not provide any evidence that the various individuals consulted by the plaintiffs prior to their retirement concealed or misrepresented any fact about which they knew or should have known under the circumstances. Most of the responses given to plaintiffs were to the effect that the interlocutor simply did not know what was contemplated. It is a stretch even to characterize these vague remarks as representations of fact.

■ More importantly, absolutely no evidence supports plaintiff's position that a specific proposed benefits package was in fact under "serious consideration" before the middle or end of September 1992 at the absolute earliest. The words of the *Fischer* court, quoted in *Vartanian,* are worth repeating here.

> The concept of "serious consideration" recognizes and moderates the tension be-

tween an employee's right to information and an employer's need to operate on a day-to-day basis. Every business must develop strategies, gather information, evaluate options and make decisions. Full disclosure of each step in this process is a practical impossibility. Moreover ... large corporations regularly review their benefit packages as part of an on-going process of cross-monitoring and personnel management.... A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities....

*Vartanian,* 131 F.3d at 270 (quoting *Fischer,* 96 F.3d at 1539).

In this case, all that the record reasonably reflects for the first nine months of 1992 is a process of developing strategies, gathering information, and evaluating options. No specific proposal was being discussed for purposes of implementation by senior management with the authority to implement that change, until *long* after the plaintiffs had received answers to their inquiries and, in the case of almost all the plaintiffs, after they had left the company's employ. Given these facts, there was no material misrepresentation.

■ The statements by CEO Wheeler in February 1992 provide no help to the plaintiffs. Bromides in a company newsletter about MassMutual's good financial shape and the President's intention not to make any fundamental changes, cannot be construed as affirmative representations with regard to retirement benefits. To hold otherwise would transform any effort to comment generally on a company's performance into a minefield of potential liability. At the same time, even if these sorts of platitudes could be interpreted as affirmative representations, they certainly did not constitute material misrepresentations. As already noted, no change in MassMutual's retirement offerings was under "serious consideration" at the time of Wheeler's speech or the article reporting on it.

Plaintiffs argue that the uncertainty or hesitancy exhibited by some of the defendant's employees at their depositions demonstrates that a jury should be permitted to

weigh the credibility of these witnesses at a trial. But cross-examination at trial can only undermine a witness's attempts to deny or conceal facts for which some evidentiary support exists on the record. No cross-examination, however effective, could persuade any jury, on this record, that prior to late September 1992 MassMutual had a specific proposal under discussion for purposes of implementation by senior management with authority to effect changes in MassMutual's retirement system. Anxiety about prevarication, even if it could be inferred from a witness's fumbling, is only material if the prevarication is about an issue whose determination may affect the outcome of the trial. Of this, no evidence on the record exists.

Plaintiffs argue in addition, "that a company the size of MassMutual does not have an historic, seven percent, unprecedented reduction in force without some major planning." Plaintiffs' Memorandum in Opposition (Docket No. 119) at 6. This assertion is almost certainly true. Its legitimacy, however, does not affect the court's assessment of defendants' motion because of the confusion between "planning" and "serious consideration." Both *Fischer* and *Vartanian* explicitly recognize the inevitability of corporate strategizing, gathering information and evaluating options—all of which happened here. All these activities, however, are contrasted with "serious consideration."

The record certainly demonstrates that MassMutual personnel, whether viewed as junior or senior, spent a lot of time considering the possibility of an enhanced retirement package, gathering data regarding it, and mapping out options. At the risk of repetition, no specific proposal came under consideration for implementation by senior managers until the second half of September 1992 and, more probably, well into October or November. The fact that there was "major planning" prior to this gets plaintiffs no-

where. An employer is justified in "delaying disclosure of a company's plans until a proposal becomes sufficiently firm." *Vartanian,* 131 F.3d at 271.

Moreover, this is not a case where "clever manipulation" of the criteria set out in *Fischer* works to relieve the defendant of liability. This is, in the words of *Vartanian,* a "typical case, where there is no evidence of a deliberate attempt to circumvent ERISA." *Id.* at 272. Thus, "a straightforward application of the *Fischer II* test is all that is required." *Id.*

In whatever theoretical pigeonhole plaintiffs' claims are placed—misrepresentation, breach of the duty of good faith, or estoppel—all of these common law causes of action break on the same rock: the record simply reflects no misrepresentation on the part of any of MassMutual's employees regarding a material fact.[4] *See Fischer,* 96 F.3d at 1543 (estoppel claim fails since absence of "serious consideration" means "no material misrepresentations were made.")

## VI. CONCLUSION

At the time this case was filed, the unevolved law in this area seemed to offer plaintiffs a possible opportunity for recovery. Unfortunately for them, in the intervening years this possibility has disappeared. The outcome now, especially after such a long wait, must certainly be disappointing. But to protract a case with no chance of success would in the end only deepen the frustration.

For the foregoing reasons, the defendants' Motion for Summary Judgment will be allowed.[5]

A separate Order will issue.

---

**4.** Plaintiffs offer two theories of estoppel, promissory and equitable estoppel. Defendants take the position that the promissory estoppel claim is entirely inapplicable, since this theory arises only in circumstances where the parties essentially enter into a contract. It is not necessary to address this interesting legal argument, however, since even under plaintiffs' own interpretation, the elements of estoppel in any form cannot be made out.

**5.** Defendant MassMutual takes the position that the co-defendant in this case, the Massachusetts Mutual Voluntary Termination Program, should be dismissed on the ground that it is only a potential defendant in a claim pursuant to ERISA and cannot otherwise sue or be sued. In view of the court's action on the Motion for Summary Judgment, it is unnecessary to address this argument. Judgment will enter for both defendants.