United States Court of Appeals
For the First Circuit

No. 98-1654

STANLEY A. RODOWICZ, ET AL.,

Plaintiffs, Appellants,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, ET AL.,

Defendants, Appellees.

No. 98-1690

STANLEY A. RODOWICZ, ET AL.,

Plaintiffs, Appellees,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael Ponsor, U.S. District Judge]

Before

Boudin, Circuit Judge, 

Aldrich and Campbell, Senior Circuit Judges.

John C. Sikorski with whom Keith A. Minoff and Robinson,
Donovan, Madden & Barry, P.C. were on brief for plaintiffs.
David G. Cohen with whom Charles S. Cohen and Egan, Flanagan
and Cohen, P.C. were on brief for defendants.

September 15, 1999

CAMPBELL, Senior Circuit Judge. Plaintiffs each retired
from defendant Massachusetts Mutual Life Insurance Company
("MassMutual" or "the Company") under terms that were less
favorable than those in a special offer made to employees soon
after. They filed suit against MassMutual and the Massachusetts
Mutual Voluntary Termination Program ("VTP"), alleging that by
failing to reveal that a more favorable retirement option was
forthcoming, MassMutual violated its fiduciary duties under the
Employee Retirement Income Security Act of 1974 ("ERISA") (codified
at 29 U.S.C. 1001 et seq.). Plaintiffs also alleged 
misrepresentation under Massachusetts common law. The district
court dismissed plaintiffs' ERISA claims on the ground that the
severance package offered by the Company did not constitute a
"plan" for purposes of ERISA. Exercising supplemental
jurisdiction, the court also granted summary judgment dismissing
the state law misrepresentation claims as well as later-added
estoppel claims. Plaintiffs appeal from the grant of summary
judgment on their state law claims. MassMutual cross-appeals from
the district court's ruling that the severance package is not a
"plan" governed by ERISA. The Company contends that should the
case be remanded to the district court, only plaintiffs' ERISA
claims will survive. 
For the reasons that follow, we affirm the district
court's dismissal of plaintiffs' ERISA claims. We also affirm,
although on grounds somewhat different from those stated by the
district court, the dismissal of most of plaintiffs' state law
claims, but reverse and remand for trial the claims of three of the
eight plaintiffs.
I. FACTS 
This case has followed a torturous path. The underlying
facts and procedural history are set forth in two opinions below. 
See Rodowicz v. Massachusetts Mutual Life Ins. Co., 857 F. Supp.
992 (D. Mass. 1994); Rodowicz v. Massachusetts Mutual Life Ins.
Co., 3 F. Supp.2d 1481 (D. Mass. 1998). We summarize the facts
pertinent to the issues raised in the parties' appeals. 
In 1990, MassMutual began to be concerned that senior
executives were not leaving the company in sufficient numbers to
make room for the promotion of other executives. To address this
problem, employees drafted a 1990 Voluntary Incentive Program
("VIP"), which was intended to induce more senior executives to
retire. The VIP was never adopted. However, the VIP documents
were saved by the Company for possible use at a later date. 
During the summer of 1991, for the first time in
MassMutual's history, two ratings agencies lowered their ratings of
MassMutual products. The agencies were especially concerned that
MassMutual was over-invested in real estate, creating the danger 
that losses in that sector could impact negatively upon the
Company's value. The agencies' downrating occurred at a time when
both the national economy and the insurance industry were
experiencing economic troubles. 
MassMutual thereupon began to consider what measures it
could take to lower costs. As employee salaries comprised the
largest single category of cost, at the end of 1991 senior
executives at MassMutual looked into reducing staffing levels. 
After consideration, however, the Company decided against workforce
reduction at the time.
In February 1992, Thomas Wheeler, MassMutual's Chief
Executive Officer, delivered an annual "state of the company"
speech to all employees. The February 14, 1992 issue of the
company newsletter, the MassMutual News, summarized Wheeler's
remarks. Wheeler stated, in essence, that MassMutual was in good
financial condition. He stated that while the ratings downgrade
had "hurt our pride," there "would be no change in how we do
business." Wheeler went on to state: "We are a company with
integrity. We handle our business ethically and are better than
our competitors." During the speech, Wheeler made no reference to
any reduction in the Company's workforce. 
In March 1992, John Pajak, MassMutual's Chief Operating
Officer, assigned to senior members of his management team the task
of determining the costs and savings from a workforce reduction. 
In connection with this assignment, Susan Alfano, Senior Vice
President in Charge of Human Resources, gathered data from the
Company's outside employee benefits consultant. Between March and
September, 1992, Alfano thoroughly analyzed the costs and benefits
of a reduction in force. 
On September 17, 1992, Wheeler, Pajak, and other senior
MassMutual executives met for the purpose of reviewing the
Company's five-year budget. During the meeting, Wheeler and Pajak
discussed MassMutual's wages and salaries paid, which, as said,
were the Company's largest operating expense. Wheeler asked Pajak
to develop some options for reducing this expense. Specifically,
Wheeler instructed Pajak to "dust off" the VIP that had been
developed in 1991.
On September 30, 1992, Pajak and Alfano made a
presentation to the President's Cabinet, a formal MassMutual
governing body that consisted of senior executives who reported
directly to Wheeler. Pajak and Alfano recommended that the Company
consider the possibility of a two-step reduction in force, in which
a voluntary termination program ("VTP") would be followed by 
involuntary layoffs, to be completed by early 1993. Immediately
following this presentation, Pajak and Alfano were instructed to
develop the details of such a program for further consideration. 
In early October, 1992, senior MassMutual employees began
developing the specifics of a workforce reduction program. By
October 12, 1992, the terms of the VTP were drafted, and the
Compensation Committee of MassMutual's Board of Directors for the
first time authorized Wheeler to adopt the plan at his discretion. 
On October 19, 1992, Wheeler decided to adopt the VTP. The Company
announced the adoption of the plan on October 23, 1992. The terms
of the VTP were not finally settled and the plan documents were not
signed until mid-November, 1992.
The VTP was open to most full-time MassMutual employees,
about 4,000 in number. The plan provided for a one-time, lump sum
severance bonus equal to: (1) three weeks of salary for every year
of service, up to a maximum of 78 weeks, or (2) one week of salary
for each full $5,000 of compensation, and a proportionate amount
for an increment less than $5,000, up to a maximum of 52 weeks. 
The Company set December 1, 1992 as the deadline for eligible
employees to elect to participate in the VTP. At its discretion,
however, the Company could defer an employee's election date beyond
the December 1 deadline, but in no case past June 30, 1993. The
VTP included a mechanism whereby employees to whom the Company
denied benefits could appeal from the denial. 
Only employees who retired on or after October 23, 1992
and before January 2, 1993 were eligible to receive benefits under
the VTP. Each of the named plaintiffs retired from MassMutual
between August 1, 1992 and October 1, 1992. All of the plaintiffs
would have received substantially higher retirement benefits if
they had waited to retire until after October 23, 1992.
Plaintiffs each claim to have decided to retire after
being lulled by misrepresentations made by Company personnel to the
effect that no change in retirement benefits was planned. The
specific allegations are set forth below. 
Plaintiff Stanley Rodowicz claims that in late August or
early September 1992, Laura Cowles, an employee in Corporate Human
Resources, told him that the Board of Directors had decided that
there would be no change in the retirement package. Plaintiff
Barbara Binsky alleges that in or around May 1992, she asked Byron
Mattson, a Second Vice President, whether there was going to be any
golden parachute or early retirement incentive. He answered
"absolutely not, there will be no golden handshake." Later, Binsky
asked a similar question of Priscilla Dill, a retirement counselor,
who replied: "I really don't think there will be anything."
Plaintiff Anne Buck alleges that in July 1992, she was
told by Dill that "I am not aware of anything coming down the
road," or, as far as Dill knew at that point in time there was
nothing going on with retirement packages. Sometime before May
1992, Michael Walker, Buck's former boss, allegedly told her that 
"anything can happen, but we have no definite plans [to adopt any
enhanced benefits]."
Plaintiff Patricia Kennedy claims that in the spring of
1992, she was present when her boss, Linda Egan, told people at a
department meeting that there would not be any severance program or
early retirement incentive program. Plaintiff James Lemon claims
that in the summer of 1992, he attended a retirement meeting at
which Jack Wilson, a supervisor in Human Resources, announced that
there would be no enhanced benefit package. Also, in 1985, Kenneth
Cardwell, a MassMutual employee without any responsibility for
employee benefits, had told Lemon that a severance payment offered
to employees in other divisions would not be offered to his
division. 
Plaintiff Margaret Stevens alleges that in April 1992,
she was told by Pat Ogoley, a retirement counselor, that she [Ms.
Ogoley] did not know whether there would be any early retirement
incentives. At some other time, another retirement counselor,
Lois DeGray, indicated in response to an inquiry from Stevens that
there would not be any enhanced benefit package or "golden
handshake."
Plaintiff Sigmund Ziemba claims that in the spring of
1992, he happened to see Robert Pouliot, a senior officer at the
company, in a hallway. Pouliot asked Ziemba how he was, and Ziemba
responded that he was considering retirement but was concerned, as
he understood that there might be a "package." Pouliot responded
that he did not know, but that that was not what he had heard.
Plaintiff Raymond Faniel assumed that, as a forty-five
year employee, MassMutual would keep him abreast of any pending
changes in employee benefits. In March 1992, Faniel spoke with 
Priscilla Dill who, in response to Faniel's statement that it
"doesn't look like there [will] be any changes," stated "I don't
know, I don't think so, I haven't heard anything." 
In addition to these specific statements, each of the
plaintiffs asserted that they were misled by Wheeler's statements,
quoted in the February 12, 1992 MassMutual News, to the effect that
the Company was in good financial condition and there would be "no
change" in the Company's course. 
II. PROCEDURAL HISTORY
Plaintiffs brought suit in federal court, invoking ERISA
and the district court's federal question jurisdiction. The
plaintiffs' original complaint contained two counts under ERISA for
breach of fiduciary duty and improper administration of an employee
benefit plan, as well as one count under Massachusetts common law
alleging negligent and/or intentional misrepresentation. In an
opinion issued on July 27, 1994, the district court denied, in
part, defendants' motion to dismiss with regard to the two ERISA
counts but allowed the motion with regard to the misrepresentation
claims on the ground that plaintiffs' common law misrepresentation
claims were preempted by ERISA. See Rodowicz, 857 F. Supp. at 999. 
In 1995 this court, in Belanger v. Wyman-Gordon Co., 71
F.3d 451, clarified the circumstances under which benefits given to
employees would constitute a "plan" for purposes of ERISA. The
district court ordered the parties to submit memoranda regarding
the applicability of Belanger, and, thereafter, concluded that the
MassMutual VTP did not, in fact, constitute an employee benefit
"plan" within the meaning of ERISA. See Rodowicz v. Massachusetts
Mutual Life Ins. Co., 915 F. Supp. 486, 489-90 (D. Mass. 1996). 
Hence the district court, sua sponte, dismissed plaintiffs' ERISA-
based claims.
The district court was then faced with a rather unusual
situation. The effect of the court's ruling that the VTP was not
a "plan" subject to ERISA was to leave plaintiffs with no viable
claims to pursue, as the court had previously dismissed all of
plaintiffs' state law claims on the basis of ERISA preemption. As
it seemed unfair to deprive plaintiffs of an opportunity to pursue
their common law claims "merely as an outcome of the rapidly-
evolving nature of ERISA law," the district court reconsidered and
vacated its July 27, 1994 ruling and reinstated plaintiffs' common
law misrepresentation claims. Id. at 491. The district court also
allowed plaintiffs to amend their complaint to assert additional
common law claims for violation of the covenant of good faith and
fair dealing, and both promissory and equitable estoppel. The
court retained jurisdiction over the common law claims "as a matter
of discretion." Id.
In an opinion issued on April 24, 1998, the district
court granted defendants' motion for summary judgment as to all of
plaintiffs' common law claims. See Rodowicz, 3 F. Supp. 2d at
1489. The court based its decision primarily upon Vartanian v.
Monsanto Company, 131 F.3d 264 (1st Cir. 1997), in which we held
that an employer has a fiduciary duty under ERISA to disclose
changes in retirement benefits at the point when "serious
consideration" of the change in benefits occurs. See id. at 268. 
The district court concluded that summary judgment was warranted as
to all of plaintiffs' claims because plaintiffs could not
demonstrate that the VTP was under "serious consideration" by
MassMutual until at least September 1992, by which time six of the
eight plaintiffs had already retired, and after which neither of
the two remaining plaintiffs made any inquiry regarding possible
changes in retirement benefits. 
III. DISCUSSION 
On appeal, plaintiffs assert that the district court
erred in granting summary judgment in favor of defendants on the
state common law claims. In its cross-appeal, MassMutual asserts
that the district court erred in concluding that the VTP was not a
"plan" governed by ERISA. The Company argues that in the event we
determine that reversal of the district court's grant of summary
judgment is warranted in any respect, plaintiffs should be
permitted to proceed, if at all, only with regard to their ERISA-
based claims. We will first address the issue raised by
MassMutual's cross-appeal. 
A. Dismissal of the ERISA Claims
The district court dismissed plaintiffs' ERISA-based
claims on the ground that the MassMutual VTP was not an "employee
benefit plan" governed by ERISA. Our standard of review to such a
ruling is deferential. "[A]s long as the trial court accurately
applies the relevant legal standards, the existence vel non of an
ERISA plan is principally a question of fact, and the court of
appeals must defer to the district court's judgment unless that
judgment is clearly erroneous." Belanger v. Wyman-Gordon Co., 71
F.3d 451, 453 (1st Cir. 1995).
"The beacon by which we must steer" to determine whether
the MassMutual VTP is a covered ERISA "plan" is the Supreme Court's
opinion in Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987). 
Id., 71 F.3d at 454. In Fort Halifax, the Court stated that an
employee benefit package is such a "plan" only if its "provision by
nature requires an ongoing administrative program to meet the
employer's obligation." Id. at 11. See also District of Columbia
v. Greater Wash. Bd. of Trade, 506 U.S. 125, 130 n.2 (1992) (plan
requires "some minimal, ongoing 'administrative' scheme or
practice"). In Fort Halifax, the Court found that a Maine statute
requiring employers to tender a one-time severance payment to
displaced employees was not a "plan" because it called for no more
than a "one-time, lump-sum payment triggered by a single event." 
Id. at 12. ERISA did not apply because the Maine statute created
no "need for an ongoing administrative program for processing
claims and paying benefits." Id. 
In Fort Halifax, the Supreme Court emphasized that 
Congress had enacted ERISA in order to (1) protect employees from
a "patchwork scheme" of employee benefit regulations, and (2)
safeguard the financial integrity of employee benefit funds over
the long term. See id. at 12, 15-16. Neither concern is
implicated by a one-time payment triggered by a single event. By
contrast, ongoing investments and obligations may give rise to a
"patchwork scheme" of benefit regulations that are vulnerable to
employer abuse, and thus implicate the purposes of ERISA. See id.
at 16. 
Following Fort Halifax, this court has stated that "the
existence of a plan turns on the nature and extent of an employer's
benefit obligations." Belanger, 71 F.3d at 454. See also Wickman
v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir.) (the
"crucial factor in determining if a 'plan' has been established is
whether the [proffering of an employee benefit] constituted an
expressed intention by the employer to provide benefits on a
regular and long term basis"), cert. denied, 498 U.S. 1013 (1990). 
"[S]o long as a proffered benefit does not involve employer
obligations materially beyond those reflected in Fort Halifax . .
. the benefit will not amount to a plan under the ERISA statute." 
Belanger, 71 F.3d at 455. 
In Belanger, we held that a series of early retirement
offers by which the defendant employer committed to give each
eligible employee a one-time, lump-sum severance bonus equal to a
week's salary for each year of employment with the company did not
constitute a "plan" for purposes of ERISA. We stated that these
offers were "precisely the kind of one-time, lump-sum payment that
the Fort Halifax Court clearly excluded from the pantheon of ERISA
plans." Id. at 455. By contrast, in Simas v. Quaker Fabric Corp.,
6 F.3d 849 (1st Cir. 1993), we had held that the Massachusetts "tin
parachute" statute, which authorized severance pay for employees
who lost their jobs within twenty-four months following a corporate
takeover, required an ongoing administrative scheme and was
therefore a "plan" for purposes of ERISA. The "tin parachute"
statute was triggered separately for each employee by the
employee's individual termination within one of several alternative
time periods. The statute also required the plan administrator to
determine whether each employee was eligible for unemployment
compensation under Massachusetts law. We described this as
"effectively a cross-reference to other requirements," most
importantly that the employee not have been discharged "for cause"
within the meaning of state law. See id. at 853. We thought that 
individualized determinations, which would have taken place over
the course of at least two years after the takeover, required
"ongoing administrative obligations . . . of a kind and over a time
period, that go far enough beyond Fort Halifax to call the regime
a 'plan' within the meaning of ERISA." Id. 
Applying these precedents, the district court concluded
that the MassMutual VTP "bears a striking resemblance to the
individual severance packages in Belanger." Rodowicz, 915 F. Supp.
at 489. The district court reasoned that the one-time bonus
offered for the two-month period in the VTP, like the offers made
in Belanger, was available to virtually all full-time MassMutual
employees, required little in the way of administrative burden or
expense, and did not require that the Company make a long-term
financial commitment to any employee who chose to participate in
the VTP. See id. The district court recognized that the VTP
expressly excluded employees who had been "involuntarily
terminated," calling for a determination that might be likened to
the "for cause" decision in Simas. But based upon its
interpretation of the VTP documents, the district court thought
that the type of individualized determination required in Simas
would not be required under the VTP, as the administrator of the
VTP was authorized in his discretion to exclude all employees who
had been terminated "for any reason or no reason at all." See id.
at 490. No careful assessment of "cause" would be required.
Further, unlike the plan in Simas, the district court reasoned that
the VTP did not require the administrator to make exclusion
determinations over an extended period of time. See id. Finally,
the district court concluded that the Company's decision to defer
the election dates of some employees up to June 30, 1993 imposed no
ongoing administrative burdens or financial obligations on the
Company, but rather merely deferred the writing of a check until
that time. See id. 
We are unable to say that the district court's evaluation 
that, on its particular facts, the MassMutual VTP did not
constitute an ERISA "plan" was "clearly erroneous." See Belanger,
71 F.3d at 453. True, the VTP authorized certain exclusions and
deferrals, as well as appeals by disappointed employees, making it
somewhat less mechanical and unthinking than the Maine statutory
scheme in Fort Halifax and the one-time payment schemes in
Belanger. Yet, as the district court found, the VTP did not call
for the sort of ongoing, individualized determinations necessitated
by the "tin parachute" statute addressed in Simas. The question
under Fort Halifax, as we acknowledged in Simas, is a matter of
degree. See Simas, 6 F.3d at 853. "[S]o long as Fort Halifax
prescribes a definition based on the extent and complexity of
administrative obligations, line drawing of this kind is necessary
and close cases will approach the line from both sides." Simas, 6
F.3d at 854. The district court's conclusion that the VTP did not
go significantly beyond the employer obligations in Fort Halifax
was a supportable one. See id. at 12 (no plan for purposes of
ERISA in absence of "periodic demands on [employer] assets that
create need for financial coordination and control"). The court
identified the correct legal standard and supportably found that
the VTP fell closer to the factual situation in Belanger than in
Simas. We, therefore, hold that plaintiffs' ERISA-based claims
were properly dismissed by the district court on summary judgment.
B. The State Law Claims
After the district court dismissed plaintiffs' ERISA-
based claims, it retained jurisdiction over plaintiffs' state
common law claims and dismissed all of them on summary judgment. 
We review de novo the district court's grant of summary judgment. 
See Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104,
108-09 (1st Cir. 1997). Summary judgment is appropriate where "the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). While we draw all inferences in the light most favorable to
the non-moving party, here the plaintiffs, "[t]he mere existence of
a scintilla of evidence in support of the plaintiff's position will
be insufficient; there must be evidence on which the jury could
reasonably find for the plaintiff." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 252 (1986). 
The district court advanced alternative reasons for
entering summary judgment in favor of MassMutual with regard to
plaintiffs' common law claims. Under Massachusetts law, a
plaintiff in a misrepresentation action must prove a false
statement of material fact made to induce the plaintiff to act,
together with reasonable reliance on the false statement to the
plaintiff's detriment. See Zimmerman v. Kent, 31 Mass. App. Ct.
72, 77 (1991). The district court concluded without explanation
that "[t]he undisputed facts confirm that no employee of the
defendant, knowingly or unknowingly, conveyed a false statement of
any kind, let alone one of material fact, to the plaintiffs to
induce them to act." Rodowicz, 3 F. Supp.2d at 1487. The court
also stated, again without elaboration, that it was "a stretch" to
characterize any of the statements made to plaintiffs as
representations of fact at all. See id. at 1488. 
The district court did not ultimately rest its grant of
summary judgment on principles of Massachusetts tort law, however. 
"More importantly," the district court continued, "absolutely no
evidence supports plaintiff's position that a specific proposed
benefits package was in fact under 'serious consideration' before
the middle or end of September 1992 at the absolute earliest." Id.
at 1488. The district court borrowed its "serious consideration"
criterion from Vartanian v. Monsanto Co., 131 F.3d 264 (1st Cir.
1997). There we held that an employer breaches its fiduciary duty
under ERISA when it misrepresents to its employees that no change
in benefits is forthcoming when, in fact, the employer has such a
change under "serious consideration." See id. at 272. We held
that "serious consideration" of a change in plan benefits exists
when: "(1) a specific proposal which would affect a person in the
position of plaintiff (2) is being discussed for purposes of
implementation (3) by senior management with the authority to
implement that change." Id. The district court concluded that
these three factors did not coalesce here until, at the earliest,
September 30, 1992, when Pajak and Alfano made their presentation
to the President's Cabinet. As all but two of the plaintiffs had
retired prior to that time, and as the two remaining employees made
no inquiries regarding an enhanced retirement package after
September 17, 1992, the district court concluded that none of the
plaintiffs had a viable misrepresentation claim. 
Plaintiffs assail the district court's conclusion that
"although technically advanced under theories of [Massachusetts]
common law," their state law claims are "controlled by the body of
decisions governing lawsuits under [ERISA]." Rodowicz, 3 F. Supp.
2d at 1486. They argue on appeal, as they did below, that the
district court should have applied Massachusetts common law to each
of their claims. Plaintiffs assert that an application of
Massachusetts common law principles would lead to the conclusion
that there are triable issues of fact that preclude summary
judgment as to each of their claims. We agree with plaintiffs that
Massachusetts common law provides the relevant yardstick. Using
that yardstick, we believe it was error to grant summary judgment
against three of the plaintiffs, although we affirm as to the
others. 
The "serious consideration" test is not a product of the
common law, but rather was developed by federal courts in
litigation involving ERISA claims for breach of fiduciary duty. In
Vartanian, this circuit adopted a mode of analysis utilized by the
Third Circuit in Fischer v. Philadelphia Elec. Co., 96 F.3d 1533
(3d Cir. 1996), cert. denied, 117 S. Ct. 1247 (1997)("Fischer II"). 
We said we adopted the Fischer II approach because of the
"conflicting interests that ERISA seeks to reconcile." Vartanian,
131 F.3d at 271. We pointed out that Congress had sought in ERISA
to protect employee pensions and other benefits while not
discouraging employers from offering such benefits in the first
place. See id. ("Indeed, it is not implausible that imposing a
threshold lower than that of Fischer II would frustrate the very
purposes for which a severance program typically is designed: to
reduce a workforce by voluntary means"). We saw the "serious
consideration" test as "delineat[ing] the point at which one form
of reasonable employer behavior, namely the confidential
consideration of an employee severance proposal, is overbalanced by
the corresponding fiduciary duty imposed by ERISA." Vartanian, 131
F.3d at 268. Under the test, only those changes in benefits that
have reached a level of "serious consideration" and are thus
"material" to an employee's decision whether to retire must be
disclosed to employees. See Fischer II, 96 F.3d at 1538 (equating
"materiality" for purposes of ERISA fiduciary duty analysis with
"serious consideration"). An employer retains its prerogative to
consider options confidentially in the normal course of business,
and has a duty to disclose its plans, where necessary to prevent an
affirmative representation from being misleading, only at a point
when a specific benefit plan exists, its implementation is being
discussed, and senior management are involved. 
Even though it had earlier determined that the MassMutual
VTP did not qualify as an ERISA "plan," the district court applied
the Vartanian "serious consideration" test because it concluded
that Massachusetts and federal law do not differ with regard to the
standard for "materiality." Rodowicz, 3 F. Supp.2d at 1487. We
agree that the basic standard of "materiality" is the same under
federal and state law "whether 'a reasonable man would attach
importance [to the facts not disclosed] in determining his choice
of action in the transaction in question,'" Zimmerman, 31 Mass.
App. Ct. at 78 (quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266
(1st Cir. 1966)) (bracketed material in original). But "serious
consideration" is a special gloss on the common law materiality
standard that has been developed by federal courts in ERISA breach
of fiduciary duty cases expressly to serve the interests implicated
by ERISA. Because of those weighty interests, the "serious
consideration" test differs from the common law materiality
standard in various ways. 
For example, the "serious consideration" test may require
more of a plaintiff in terms of proof than does the common law
materiality standard. Under Massachusetts law, a misstatement
concerning retirement benefits is "material" if it is more likely
than not that it would lead a reasonable employee to retire. But
by requiring a plaintiff to prove the existence of all three
elements under the "serious consideration" standard, courts require
that there be a "substantial likelihood" that the employee would
not have retired had the statement not been made. Compare Fischer
v. Philadelphia Electric Co., 994 F.2d 130, 135 (3d Cir.) (defining
"materiality," for purposes of "serious consideration test, as
"substantial likelihood" that the misrepresentation would mislead
a reasonable employee), cert. denied, 510 U.S. 1020 (1993)
("Fischer I") with Zimmerman, 31 Mass. App. Ct. at 78
("materiality" under Massachusetts law defined as whether
reasonable man "would attach importance [to the fact not
disclosed]"). 
Further, to satisfy the "serious consideration" test, a
plaintiff must demonstrate that a misrepresentation concerns a
specific change in benefits that is actively under consideration by
persons in senior management with the authority to implement the
change. Then and only then can an employee be said to have
reasonably relied upon a misstatement concerning changes in
benefits such that his or her claim may reach the jury. See, e.g.,
Hockett v. Sun Company, Inc., 109 F.3d 1515, 1524 (10th Cir. 1997)
(holding that misrepresentations concerning a severance plan did
not become material under "serious consideration" test until a
meeting was convened that "gathered together the heads of all
departments related to employee benefits" to discuss a specific
proposal). By contrast, a trial court applying common law
principles may withdraw a misrepresentation case from the jury only
upon concluding that the fact misrepresented "is so obviously
unimportant that the jury could not reasonably find that a
reasonable man would have been influenced by it."). Restatement
(Second) of Torts 538(2)(a), comment e (emphasis supplied). 
In our view, a reasonable employee could "attach
importance" to and be influenced by misstatements that fail to meet
the strict requirements of the "serious consideration" test. A
statement, for example, that no change in benefits is being
contemplated made at a time when several proposals urging such
changes are on the table but, as yet, senior management with the
authority to implement a change has not yet chosen a specific plan
for implementation cannot be said to be "so obviously unimportant
that the jury could not reasonably find that a reasonable man would
have been influenced by it." In such a case, the existence of the
proposals and the attendant discussion might reasonably be expected
to influence a decision with respect to retirement. 
We hold that it was error for the district court to apply
the "serious consideration" test to plaintiffs' state law claims. 
The Massachusetts Supreme Judicial Court may someday be persuaded
to apply the "serious consideration" test in situations analogous
to this, but it has not yet done so. Until such time, the 
standard for "materiality" is as set forth in Massachusetts case
law and the Restatement (Second) of Torts. Cf. Adams v. Coveney,
162 F.3d 23, 26 (1st Cir. 1998) (concluding that Massachusetts
courts would not necessarily adopt federal "responsible person"
standard in determining whether individual had duty to pay
withholding and meals taxes, and applying instead state common law
standard). Applying that standard, we cannot say that all of the
plaintiffs' claims fail on summary judgment.
Under Massachusetts law, plaintiffs had to demonstrate
that MassMutual (1) made false statements of material fact (2) to
induce them to retire when they did, and (3) that they reasonably
relied on those statements to their detriment. Zimmerman, 31 Mass.
App. Ct. at 77. If plaintiffs failed to demonstrate any one of
these elements, their misrepresentation claims must be dismissed. 
The statements allegedly relied upon by plaintiffs must
be ones of fact, not of "expectation, estimate, opinion, or
judgment." Id. See also Powell v. Rasmussen, 355 Mass. 117, 118
(1986). "A representation is one of opinion if it expresses only
. . . the belief of the maker, without certainty, as to the
existence of the fact." Restatement (Second) of Torts 538A
(1977) (emphasis supplied). See McEneaney v. Chestnut Hill Realty
Corp., 38 Mass. App. Ct. 573, 574 (1995). We agree with the
district court that it is too much of "a stretch" to characterize
many of the statements upon which plaintiffs rely as ones of fact. 
Rodowicz, 3 F. Supp.2d at 1481. 
The statements allegedly made to plaintiffs Binsky, Buck,
Stevens, Ziemba, and Faniel "fall[] within the ordinary rule that
false statements of opinion, of conditions to exist in the future,
or of matters promissory in nature" are not actionable in a claim
for misrepresentation. Yerid v. Mason, 341 Mass. 527, 530 (1960). 
The statements made to these plaintiffs were cautionary in nature
and represented nothing more than the opinion or belief of the
declarant as to the prospect of future changes in retirement
benefits. See id. at 530-31 (home seller's statements to the
effect that buyers "would have no further trouble with water" in
cellar were expressions of strong belief, not statements of fact). 
Some of the statements relied upon were no more than ordinary
workplace gossip, which is plainly not actionable. Thus, to the
extent that they are premised upon these statements, the
misrepresentation claims of plaintiffs Binsky, Buck, Stevens,
Ziemba, and Faniel were properly dismissed as they did not meet the
"statement of fact" requirement under Massachusetts law.
We reach a similar conclusion insofar as plaintiffs'
misrepresentation claims are each based upon the statements made by
President Wheeler during the "state of the company" speech, as 
reported in the MassMutual News. As the district court stated:
Bromides in a company newsletter about
MassMutual's good financial shape and the
President's intention not to make any
fundamental changes, cannot be construed as
affirmative representations with regard to
retirement benefits. To hold otherwise would
transform any effort to comment generally on a
company's performance into a minefield of
potential liability. 

Rodowicz, 3 F. Supp.2d at 1488. We agree that the statements
reported in the Company newsletter did not constitute
representations, much less material misrepresentations, concerning
the Company's plan with regard to retirement benefits. Thus, to
the extent that plaintiffs' claims are based upon statements in the
company newsletter, they were properly dismissed. 
Certain of plaintiffs' misrepresentation claims fail for
an additional reason. Plaintiffs sued MassMutual based upon
alleged material misrepresentations made by certain individual
employees concerning retirement benefits. In Massachusetts, an
employer may be held liable for the tortious acts of an employee 
if the acts were committed within the scope of the employment. See
Worcester Ins. Co. v. Fells Acre Day School, Inc., 408 Mass. 393,
404 (1990). Conduct of an employee is within the scope of
employment if it is of the kind he is employed to perform. Wang
Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854,
859 (1986). In order for plaintiffs to hold MassMutual liable for
the alleged misrepresentations made by its employees, plaintiffs
must demonstrate that the declarant had actual or, at least,
apparent authority to speak on behalf of the company with respect
to retirement benefits. See, e.g., Hudson v. Mass. Property Ins.
Underwriting Ass'n, 386 Mass. 450, 457 (1982); see also Restatement
(Second) of Agency 8 (1957). 
The record demonstrates that MassMutual retirement
counselors and Human Resources personnel were cloaked with actual
or, at least, apparent authority to speak on behalf of the Company
with regard to retirement benefits. Cf. Fischer I, 994 F.2d at 134
(benefits counselors possessed apparent authority to provide
information and guidance with regard to changes in employee
benefits). However, Byron Mattson, Michael Walker, Linda Egan,
Kenneth Cardwell, and Robert Pouliot, upon whose statements certain
plaintiffs claim to have relied, were neither retirement counselors
nor Human Resources personnel, and therefore did not possess actual
authority to speak on behalf of the Company with regard to employee
benefits. Further, there is no evidence in the record that any
of these employees had apparent authority to answer questions on
behalf of the Company concerning changes in retirement benefits. 
To the contrary, as plaintiff Faniel, for example, stated in his
deposition, employees were aware that retirement counselors were
the Company representatives "that you were to go to if you had any
questions about retirement benefits." With regard to employees
Matson, Walker, Egan, Cardwell, and Pouliot, no evidence even
suggests "conduct by the principal [that] . . . causes a third
person reasonably to believe that a particular person . . . has
[such] authority." Neilson v. Malcolm Kenneth Co., 303 Mass. 437,
441 (1939). Accordingly, the statements made by these employees
to, respectively, plaintiffs Binsky, Buck, Kennedy, Lemon, and
Ziemba were not made on behalf of the Company and, for that reason,
were not actionable.
We also conclude, although again on somewhat different 
grounds than those relied upon by the district court, that summary
judgment was properly granted with regard to the equitable estoppel
claims brought by plaintiffs Binsky, Buck, Kennedy, Ziemba, and
Faniel. Under an equitable estoppel theory, plaintiffs must
demonstrate that they relied upon a misrepresentation of past or
present material facts. See Boylston Development Group, Inc. v. 22
Boylston Street Corp., 412 Mass. 531 (1992). See also Restatement
(Second) of Torts 872 (tort liability based upon equitable
estoppel requires "definite misrepresentation of fact"). As
stated, many of the alleged representations upon which plaintiffs
claim to have relied were mere statements of opinion or belief, not
definite representations concerning past or present facts. Still
others were made by employees without the requisite authority to
bind the Company in the area of employee benefits. Hence the
district court properly granted summary judgment as to most of
plaintiffs' equitable estoppel claims.
The preceding discussion disposes of the claims of
plaintiffs Binsky, Buck, Kennedy, Ziemba, and Faniel. However, we
conclude that three of the eight named plaintiffs Rodowicz,
Lemon, and Stevens have viable misrepresentation and estoppel
claims under Massachusetts law. Plaintiff Rodowicz alleges that in
late August or early September, 1992, Laura Cowles, an employee in
MassMutual's Corporate Human Resources department, told him that
the Board of Directors had decided there would be no changes in the
retirement package. A jury could reasonably find that Cowles
possessed the requisite authority to speak for the Company with
regard to retirement benefits. Further, under Massachusetts law,
Cowles's statement, if made, that the Board of Directors had
decided there would be no retirement package changes could be found
to be an assertion of fact as to the Board's action. It is not a
statement of mere opinion or belief. Finally, again applying
Massachusetts law, a jury could reasonably find that Cowles's
statement in September 1992 that the Board had decided there would
be no changes in retirement benefits was material and that Rodowicz
reasonably relied upon it. Thus, plaintiff Rodowicz is entitled to
present his misrepresentation and equitable estoppel claims to a
jury, although, as said supra, he cannot rely upon the statements
made by President Wheeler in the "state of the company" speech. 
We reach the same conclusion with regard to plaintiffs
Lemon and Stevens. In the summer of 1992, Lemon was allegedly told
by Jack Wilson, a Human Resources employee with responsibility for
employee benefits, that there would be no enhanced benefit package. 
Plaintiff Stevens was told by Lois DeGray, a retirement counselor,
that there would not be any enhanced benefit package or "golden
handshake." These are statements of fact as to which a reasonable
jury could find that Wilson and DeGray were authorized to bind the
Company. A reasonable jury could also find that the statements
were material under the Massachusetts common law standard and that
plaintiffs Lemon and Stevens reasonably relied upon the
representations. Thus, like plaintiff Rodowicz, plaintiffs Lemon
and Stevens are also entitled to present their state common law
claims to a jury.
In saying as we have at several places that the claims of
these three plaintiffs could be the basis for recovery in a jury
trial, we do not in any way mean to suggest that the plaintiffs
will or should necessarily prevail. Issues of fact and assessment
remain to be resolved and, in addition, the evidence at trial may
vary from what we have assumed. But we are required on summary
judgment to view the issue from the standpoint of the party
resisting summary judgment and while the case may be a close one
even from that vantage, we think that the three plaintiffs in
question have crossed the threshold and that their state claims
cannot be resolved against them at this stage.
IV. CONCLUSION
To summarize, we affirm in part and reverse in part the
district court's grant of summary judgment in favor of MassMutual. 
We affirm the district court's dismissal of plaintiffs' ERISA
claims. We affirm the district court's grant of summary judgment 
in favor of MassMutual with regard to the Massachusetts common law
claims of plaintiffs Binsky, Buck, Kennedy, Ziemba, and Faniel, but
reverse the grant of summary judgment with regard to the state law
claims of plaintiffs Rodowicz, Lemon, and Stevens. The cause is
remanded for further proceedings consistent with this opinion. 
So ordered. Each party to bear its own costs.